**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Michael L. CARMACK, Sr., and Patricia**
**A. Besse, Defendants–Appellants.**

**Nos. 96–1568 & 96–2226.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 27, 1996.

Decided Nov. 15, 1996.

Suzanne M. Wissmann (argued), Office of the United States Attorney, Criminal Division, Fairview Heights, IL, for U.S.

John R. Abell (argued), Belleville, IL, for Michael L. Carmack.

Terence Niehoff (argued), St. Louis, MO, for Patricia A. Besse.

Before CUMMINGS, EASTERBROOK and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Two members of a drug operation pleaded guilty to a count in an indictment charging conspiracy to distribute marijuana. Only their sentences are at issue. Michael Carmack, who is here voluntarily, appeals the amount of marijuana attributed to his conduct. Patricia Besse is here involuntarily as the government appeals the district court's refusal to add a 2–point enhancement to her total offense level for possession of a firearm.

The conspiracy was headed by a man named Charles Trione, who obtained marijuana in Tucson and distributed it in Las Vegas and southwest Illinois. Carmack obtained marijuana from Trione and sold it in southwest Illinois. Besse was a courier and seller in the Trione conspiracy. When the dust settled, Carmack was sentenced to a term of 151 months, while Besse drew a term of 46 months. We first turn our attention to Carmack's appeal.

Having just said that we'll focus first on Carmack's appeal, it may seem odd that we start with an observation about Besse, but we think a point is worth making. The amount of drugs—marijuana in this case—attributed to a defendant is vitally important under the federal sentencing guidelines. And when the amount is high, and other factors make a defendant eligible for treatment as a career offender, the importance of the total takes on heightened significance. Here's why. Besse, as we shall see, agreed with the government that her relevant conduct involved 800 pounds of marijuana. Yet even if she loses this appeal, her sentence will only move from 46 months to a point in a range of 60 to 71 months (actually the guideline range is 57 to 71 months but she must get at least 60 because a statutory minimum controls). Carmack, on the other hand, was found—after a sentencing battle—to be responsible for only 25 percent of Besse's mari-

juana total, and this earned him his term of 151 months. If he can get his relevant conduct down from 200 pounds to anything less than 110, his sentence will top out at 60 months. So Carmack's sentence then would be in the neighborhood of Besse's sentence (if she loses here) despite the fact that his prior record is awful and hers is spotless. Strange things happen when applying the federal sentencing guidelines. So now, true to our previous word and without further ado, we go to Carmack's appeal. Excuse us if what we are about to say gets a little long, but a detailed review is necessary in cases like this.

The presentence report tagged Carmack with a criminal history category of VI, which he does not dispute. The report concluded that Carmack's relevant conduct involved approximately 200 pounds (90.72 kilograms) of marijuana. The report also said Carmack deserved career offender status which, with the estimated amount of marijuana involved, put his total offense level under the sentencing guidelines at 32. A 3–point reduction for acceptance of responsibility netted a guideline range of 151 to 188 months. A subsequent addendum to the presentence report indicated that Carmack attempted to obstruct justice by trying to intimidate one of the witnesses at his sentencing hearing so it urged that Carmack not get the 3–point reduction. Instead it said he should receive a 2–point enhancement for obstruction, increasing the guideline range to 262 to 327 months.[1]

At Carmack's sentencing hearing, which extended over three days (not unusual under the guidelines but almost unheard of under the old law), various members of the conspiracy testified regarding the amount of marijuana they supplied to Carmack or saw him possess. Earl Wolff, a coconspirator, testified that he sold Carmack a couple quarter-pounds of marijuana in 1988 or 1989 and that, at Trione's direction, he regularly supplied Carmack with pound amounts on approximately a weekly basis from May until October 1992. Wolff estimated that he supplied Carmack with between 20–30 pounds of marijuana.

Trione testified that he sold Carmack marijuana from May 1992 to July 1994. Carmack first purchased quarter-pound amounts, but then graduated to full pounds. Twice during the summer of 1994, Trione also sold Carmack five-pound packages, charging between $1,400 and $1,600 per pound. Trione said he personally sold Carmack between 30 and 50 pounds of marijuana, but that he knew Wolff and Marilyn Sexton supplied Carmack with marijuana when Trione was out of town, which occurred frequently.

Sexton, Trione's ex-wife, testified she sold Carmack a pound of marijuana twice and that Carmack's girl friend, Janelle Chester, picked up quarter-pounds for Carmack on several occasions. Sexton also said Carmack and Chester dropped money off on a few occasions for Sexton to give to Trione. According to Sexton, Trione told her Carmack stored marijuana for him and that he sold Carmack about 200 pounds of marijuana.

Mark Schmidt stored marijuana for Trione in a mobile home he rented from Trione. Schmidt testified that during the summer of 1994 Carmack came to the mobile home and picked up a five-pound package of marijuana Trione had left with Schmidt to give to Carmack. A few weeks later, Schmidt saw Trione and Carmack leaving Schmidt's trailer; Carmack held a package similar to the five-pound package that Schmidt had given him.

Drugs attributed to a defendant as relevant conduct under the guidelines must be proven to exist by a preponderance of the evidence. Carmack concedes that the testimony of Wolff (supplying Carmack with 20–30 pounds of marijuana), Trione (supplying Carmack with up to 50 pounds), Sexton (supplying Carmack with approximately 6¼ pounds), and Schmidt (supplying 5 pounds to Carmack and seeing Carmack holding another 5 pounds) meets the preponderance standard but that, at the most, the government has proved no more than 96¼ pounds attributable to Carmack's conduct. This conces-

---

1. This addendum does not appear in the record on appeal, but both Carmack and the govern-

ment referred to it during the sentencing hearing.

sion, however, doesn't really lay a glove on Carmack for, as we said, his goal is to keep his total under 110 pounds. Which brings us to Norman Monroe, a fellow Carmack would like to forget.

Monroe testified that he has known Carmack for 40 years. After losing contact around 1967, Monroe and Carmack reconnected in 1989, when Monroe began buying marijuana from Carmack for personal use. During 1991, Monroe said he began selling marijuana as well. He purchased marijuana from Carmack in quarter-pound amounts and sold his supply within about one or two weeks. Monroe quit selling marijuana when his house was raided by police on October 23, 1993. During the raid, police seized one quarter-pound of marijuana that Monroe said he purchased from Carmack.

After the raid, Monroe became a police informant. He testified that Carmack dropped off a quarter-pound of marijuana at Monroe's house on November 9, 1993, at a time when Monroe was wearing a tape recorder. Monroe turned the marijuana over to investigating agents. On another occasion when Monroe was wired, Carmack took Monroe to a place Trione owned in southern Illinois and acknowledged on tape during the trip that he had owed Trione about $10,000 but that the debt had been repaid.

Monroe testified he was aware that Carmack sold marijuana to Monroe's brother, who would buy quarter-pound amounts every week or two. Monroe indicated that Carmack's girl friend sold marijuana for Carmack. And, according to Monroe, he saw 20 to 30 pounds of marijuana at Carmack's farm in New Athens, Illinois, a couple of times and once had seen about 50 pounds of marijuana in Carmack's shed in Belleville, Illinois.

Monroe said he accompanied Carmack on visits to Trione's home in Las Vegas. After one trip Carmack brought back two pounds of marijuana. Monroe not only knew that Trione was Carmack's main source, but that Sexton also provided marijuana to Carmack.

Monroe also knew inside information about Carmack. For instance, he knew Carmack had been arrested for having a gun and had given the police a false name. Carmack's

counsel stipulated at the sentencing hearing that a tip from Monroe was the sole source for federal prosecution of Carmack on a separate federal "felon in possession" charge.

Monroe's stint as an informant ended in February 1994, after authorities provided him with recording equipment and $1,100 to make a drug purchase from a fellow named James Pierce. Monroe ran off with the buy money. He said he saw Carmack at Pierce's house and became scared because he believed Carmack knew Monroe was a snitch. He then spent the money on crack cocaine for his own use. Monroe was convicted of theft of the money but was not charged with selling marijuana as part of the Trione conspiracy.

During cross-examination, when confronted with inconsistencies with prior testimony regarding the timing of certain activities, Monroe admitted he had a hard time remembering dates and that "my doctor says your mind is foggy for a while, you know, but I'm doing my best." He admitted that he drank alcohol every day for about 35 years, including during the time of the conspiracy. Some of his testimony conflicted with that of Trione, Wolff, and another witness (Bobby Lee Carmack) regarding the dates of Carmack's participation in the conspiracy and whether Carmack stored marijuana for Trione.

The Drug Enforcement Agency agent who monitored the conspiracy, David Roth, testified at the sentencing hearing that he had witnessed Monroe, as an informant, pay Carmack $500 for a quarter-pound of marijuana. Roth stated that during the conversations that occurred while Monroe was wired, Carmack acknowledged that the marijuana in Monroe's house when it was raided had been provided by Carmack, that Carmack had paid off an $8,000 debt to Trione, and that Carmack had made Trione about $2 or $3 million dollars. Roth indicated that telephone logs showed 91 phone calls from Trione to Carmack between February 1992 and April 1994.

In addition, Roth testified that during the course of his investigation, Monroe demonstrated reliability as an informant. For instance, Monroe told the agent about Trione's

indoor marijuana growing operation in Las Vegas and that Trione had been ripped off in the process of setting it up; both facts turned out to be true. Monroe also provided accurate information about the involvement of Trione's sons and ex-wife in the conspiracy, and his statement that the Tucson source of the marijuana was a Mexican male turned out to be true. During his time as an informant, Monroe provided Roth with information that was consistent with other information Roth had regarding the amount of marijuana the conspiracy was bringing into southwest Illinois. In addition, while an informant, Monroe made at least two purchases of marijuana from Carmack and promptly turned the product over to Roth.

After hearing all this testimony, Judge Riley said, "The Court believes that there were approximately, again, using the standards that I have talked about, 90 pounds of product involved which is 40.77 kilograms." The judge then announced that the sentencing range was 151 to 188 months. Carmack was then sentenced to 151 months, with 5 years of supervised release and a $500 fine.

Confusion reigned. Carmack was, admittedly, a Career Offender under the sentencing guidelines because he was older than 18, had at least two qualifying prior felony convictions, and his crime of conviction involved drugs. See U.S.S.G. § 4B1.1. His criminal history category, therefore, was VI, and his guideline base offense level was pegged to the statutory maximum for his crime of conviction. The statutory maximum for marijuana dealing is, in turn, tethered to the amount of weed attributable to the defendant. If the weight is less than 50 kilograms, the statutory maximum is 5 years; if more, the cap goes up. See 21 U.S.C. § 841(b)(1)(D). Because the judge said he found "90 pounds of product involved which is 40.77 kilograms," Carmack's statutory maximum penalty was only 60 months, 91 months less than the sentence he actually received.

To his credit, Carmack's counsel tried to clear up the confusion: "Your Honor, in point of clarification, you meant to say 90.72 kilograms; is that correct? Rather than 90 pounds?", to which the judge replied: "I'm sorry. I meant to say 90 pounds, 40.77 kilograms." But then a light must have gone off, for the judge said: "Hold on. We have a problem. Ladies and gentlemen, the Court has been informed that it has made a mistake and the Court will need to think about that mistake."

A few weeks later the sentencing hearing reconvened, at which time Judge Riley stated:

It's amazing to me that the Court could have gotten this thing so out of joint [interesting term to use in a marijuana case!] as to confuse pounds and kilograms, but that's exactly what has happened, and I apologize to all for that mix-up. The Court finds that the relevant offense conduct consisted of approximately 90 kilograms of marijuana.

Judge Riley again sentenced Carmack to 151 months. In neither sentencing hearing did Judge Riley provide detailed findings regarding his calculation of the amount of marijuana attributable to Carmack. Instead, the judgment simply indicates that Judge Riley adopted the factual findings and guideline application found in the presentence report.

We sympathize with Judge Riley. Three-day sentencing hearings, with dates and drug deals tossed about, coupled with converting pounds to kilograms, can get confusing. He made a mistake, realized it, and did the right thing by calling a time-out to sort things through. And now we must decide if the record supports a finding that Carmack handled at least 50 kilograms (110 pounds) of marijuana. If it does, Carmack stays put. If it doesn't, he goes back to Judge Riley for resentencing.

Carmack argues that the testimony of Monroe is so unreliable it cannot be believed. Disregarding amounts attributable to Monroe, Carmack argues that at most the government proved by a preponderance of the evidence no more than 96¼ pounds, less than 50 kilograms. Carmack believes that Judge Riley's initial determination of approximately 90 *pounds* thus was correct.

According to Carmack, Monroe's testimony is not only uncorroborated but also partially contradicted by the testimony of Wolff and

Trione. In addition, Monroe admitted he had a foggy memory, which was supported, says Carmack, by inconsistencies in Monroe's testimony. Carmack also points out (to the surprise of no one) that Monroe was a drug user. His theft of $1,100 in government money and his use of the money to buy crack cocaine destroys his reliability. As a result, Carmack believes it was clear error for Judge Riley to place any reliance on Monroe's testimony.

■ Carmack fights an uphill battle approaching 90 degrees. He admits that the government only had to prove the amount of marijuana by a preponderance of the evidence, that Judge Riley could make credibility judgments, that Judge Riley's determination of the amount is a factual finding, and that we review those findings deferentially, with a reversal ordered only for clear error. *United States v. Banks,* 964 F.2d 687, 692 (7th Cir.), *cert. denied,* 506 U.S. 976, 113 S.Ct. 470, 121 L.Ed.2d 377 (1992). Clear error review means that the district court's decision will not be reversed unless after reviewing the entire record we are left with a definite and firm conviction that a mistake has been committed. *United States v. Flores–Sandoval,* 94 F.3d 346, 349 (7th Cir. 1996). In addition, we may affirm a sentence on any ground found in the record, regardless of the rationale employed by the district court. *Id.*

■ A sentencing judge may take any information into account in passing sentence so long as it has sufficient indicia of reliability to support its probable accuracy. *United States v. Taylor,* 72 F.3d 533, 543 (7th Cir. 1995). The "sufficient indicia of reliability" test applies as well to facts contained in the presentence report. If the standard is met, the district court may adopt the facts in the report as support for its determinations regarding quantity of drugs attributable to a defendant. *Id.*

■ Although a district judge should carefully scrutinize the statements of drug users, heightened scrutiny is not necessarily required when other factors indicate that a statement is reliable. *Id.* at 544. "[I]t is unrealistic ... to expect that government witnesses ... 'possess the credibility of people of the cloth such as rabbis, ministers, priests, and nuns.'" *Id.* (quoting *Rodriguez v. Peters,* 63 F.3d 546, 563 n. 14 (7th Cir.1995)). Discounting the estimates provided by witnesses can take into account the possibility that drug use and other factors may have affected the memories of those witnesses. *Id.*

■ Having reviewed the entire record, we find no clear error in Judge Riley's determination of Carmack's relevant conduct. Although the judge noted that Monroe specifically had credibility problems, he also said:

> [E]veryone who has testified among those persons [ (Monroe, Wolff, Trione, Sexton, Schmidt) ] has some questions regarding their respective credibility. That doesn't mean that the Court is not going to accept anything these people have said any more than I would do that to you [Carmack] simply because you have a background.... [T]he decision of the Court in coming to this conclusion [on the amount of drugs involved] is a decision that has been affected by everything the Court has heard.

Carmack wrongly asserts that Monroe's testimony was completely uncorroborated. Trione, for instance, recalled that he met Monroe when Monroe and Carmack visited Trione at his Las Vegas home in 1992. Wolff confirmed that Monroe accompanied Carmack to Las Vegas at least once. Both Trione and Sexton confirmed Monroe's testimony that Sexton also provided Carmack with marijuana. Sexton testified that Carmack stored marijuana for Trione, which corroborated Monroe's testimony that he saw 20–30 pounds in Carmack's possession a couple of times and once saw about 50 pounds.[2] In addition, Monroe participated in several purchases from Carmack and seems to have had a long-term familiarity with Carmack and his operation. Carmack himself trusted Monroe for he told him about his gun conviction under a false name and his debts to

---

2. Like Monroe, Sexton contradicted Trione's testimony regarding Carmack's storage of marijuana for Trione. Carmack, however, does not attack Sexton's veracity.

Trione. When we add the DEA agent's testimony that Monroe did provide reliable information regarding this conspiracy, we do not have a definite and firm conviction that Judge Riley made a mistake when he credited Monroe's testimony.

In addition, even if Monroe's uncorroborated testimony is disregarded, other testimony from the sentencing hearing provides a reasonable basis for coming up with at least more than 110 pounds of weed. As we have already noted, Carmack admits that the government proved 96¼ pounds attributable to his conduct. In calculating his admitted 96¼ pounds, however, Carmack has ignored the amounts of money and marijuana he discussed on tape and those amounts witnessed by or turned over to Detective Roth.[3] On the tape recordings made while Monroe wore a wire, Carmack stated that he must have made $2 to $3 million for Trione. He also discussed an $8,000 marijuana debt owed to Trione. Trione charged about $1,500 per pound, so the $8,000 was likely owed for about 5 to 6 pounds. Detective Roth witnessed a payment by Monroe to Carmack the day after Monroe turned over a quarter-pound of marijuana to Roth. Monroe previously had turned over to Roth a separate ounce of marijuana that he stated was purchased from Carmack. On tape, Carmack admitted that the quarter-pound of marijuana seized in the raid on Monroe's house was provided by Carmack. In addition, Sexton testified that Trione told her he dealt 200 pounds to Carmack, and Carmack has given us no reason to doubt her recollection. Monroe's testimony, corroborated by Sexton, indicates that Carmack had stored 20 to 30 pounds of marijuana a couple of times and once about 50 pounds.

In sum, although Judge Riley did not make specific findings other than the note in the judgment that he was relying on facts in the presentence report, any reliance upon Monroe's testimony, which involved a credibility judgment, was not so clearly unreasonable as to justify reversal. In addition, Judge Riley had other evidence from which

he reasonably could find that Carmack was involved with more than 110 pounds of marijuana. We do not have a definite feeling that a mistake was made by Judge Riley, and therefore Carmack's appeal must be rejected.

We now turn to Besse who, as we noted earlier, was a courier and seller in the Trione conspiracy. Starting from Las Vegas, she would drive to Tucson to pick up marijuana and then deliver a portion of her load to southern Illinois and the remainder to customers in New York. She also sold marijuana in the Las Vegas area. After a sale at her apartment to a confidential informant working with the Las Vegas police, a search of the residence revealed marijuana in her bedroom, bedroom closet, bathroom, and garage. The police found a Mossberg rifle near the marijuana within the bedroom closet and a Beretta semi-automatic handgun together with live rounds and marijuana within an entertainment center in the bedroom.

Besse pled guilty to the charge of conspiracy, and although not a focus of this appeal, she also agreed to a forfeiture count. In a factual stipulation in support of her guilty plea, she agreed that a "search of her residence revealed baggies of marihuana packaged for resale and a Mossberg bolt action rifle." In her plea agreement, she agreed that her relevant conduct consisted of approximately 800 pounds of marijuana and that "because a firearm was possessed, two levels are added pursuant to Section 2D1.1(b)(1)." The presentence report also concluded that Besse should receive the 2–level increase for possession of a firearm. As a result, Besse's base offense level was expected to be 26, plus 2 for the firearm, minus 3 for acceptance of responsibility, for a total offense level of 25. Coupled with a criminal history category of I, her sentencing range under the guidelines came to 57 to 71 months. Because of the weapon, Besse was ineligible for the "safety valve" of U.S.S.G. § 5C1.2, which allows a defendant to receive a sentence within a guideline range, without regard to any statutory minimum, if she

---

**3.** At oral argument, Carmack's counsel contended that the amounts witnessed by or turned over to Roth were included in the 96¼ pound amount, but the calculation in his own opening brief contradicts that statement.

meets certain criteria.[4] If the presentence report and the plea agreement were right, Besse faced a 60–month statutory minimum sentence, with a high-end potential of 71 months.

Besse signed her plea agreement on September 22, 1995, but she was first called for sentencing on February 23, 1996. In between those dates, the Supreme Court decided *Bailey v. United States*, —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). At sentencing, Besse's attorney indicated that the Supreme Court's intervening decision in *Bailey* represented a change in the law and required that the government show active use of a firearm before Besse could receive the 2–level firearm increase. Besse's counsel did concede that "in our plea agreement, we did, you know, agree that this weapon was involved in the offense."

After briefing of the issue, Judge Riley stated that he adopted the factual findings in the presentence report, but he then announced that Besse's offense level was 23. The judge did not explain how he reached that number, so the government asked for clarification. Judge Riley confirmed that he found that the firearm adjustment should not apply, stating:

> I will just say that the Court is relying upon the *Bailey* case and the findings within the *Bailey* case, and I will say further that the Court is of the opinion that the Government did not establish enough underneath the new findings of the *Bailey* case to make the weapon includable as an enhancement in this case.

Finding that she was entitled to the benefit of the "safety-valve" provision, Judge Riley sentenced Besse to 46 months of imprisonment (the guideline range at level 23 was 46 to 57 months). Other than adopting the factual findings and guidelines of the presentence report, the judge made no further statements regarding the basis for the sentence.

In its appeal of Besse's sentence, the government contends that because Besse stipulated that the firearm was connected to the offense for purposes of § 2D1.1(b)(1), the issue before the district court was strictly a question of law regarding whether *Bailey* changed the method in which the sentencing guidelines are applied. As a question of law relating to interpretation of the sentencing guidelines, *de novo* review, says the government, is appropriate. *United States v. Haines*, 32 F.3d 290, 293 (7th Cir.1994).

Besse disputes the standard of review. She argues that the district court actually made a factual determination that she was not subject to the 2–level increase under § 2D1.1—that the district court actually found that it was clearly improbable that she possessed the weapon in connection with her drug trafficking offense. The standard of review of this sort of factual determination would be for clear error.

■ We agree with the government on the standard of review. Judge Riley's interpretation of *Bailey* and its effect on the 2–level increase under § 2D1.1 presents a question of law. Prior to the *Bailey* case, Besse agreed that her possession of the Mossberg rifle triggered the 2–level increase. The objection that her attorney had at sentencing was that *Bailey* changed the law so that the 2–level increase would no longer apply to her factual situation.

Both at oral argument and in his brief, Besse's counsel contends that his argument to the district court was always that Besse entered in the plea agreement under pre-*Bailey* conditions and that had *Bailey* been

---

4. To be eligible for the "safety valve": (1) the defendant must not have more than 1 criminal history point under the sentencing guidelines, (2) the defendant must not have used violence or threats of violence or possessed a firearm or other dangerous weapon (or induced another participant to do so) in connection with the offense, (3) the offense must not have resulted in death or serious bodily injury to any person, (4) the defendant must not have been an organizer, leader, manager or supervisor of others in the offense or engaged in a continuing criminal enterprise under 21 U.S.C. § 848, and (5) the defendant must have truthfully provided to the government at or before sentencing all information and evidence that the defendant had concerning the offenses that were part of the same course of conduct or common scheme or plan. U.S.S.G. § 5C1.2. The government does not dispute that Besse satisfies all requirements of the safety valve except number two.

announced prior to Besse's plea, she would have had a different position regarding application of the 2–point enhancement.[5] Although counsel's statements immediately prior to Judge Riley's announcement of Besse's offense level support this statement, a review of the sentencing transcripts and Besse's sentencing memorandum on the *Bailey* issue shows that prior to that moment, Besse's counsel argued that *Bailey* changed the application of the guideline, not that Besse would not have entered into the stipulation. For instance, at sentencing counsel stated:

> I had a question with Ms. Wissmann whether or not under the law this would still be an evocable increase since there was no use or anything along those lines involved in the offense, and while I didn't want to object formally because, you know, we did agree to it after all, I did want to point it out to the Court that the Court might want to consider on its own if *this is not in compliance with the law of the land as it now stands....*

(Emphasis added.) In the sentencing memorandum on the issue, counsel wrote:

> [T]he *Bailey* decision does have a direct bearing on the Court's determination of whether or not the defendant is required to have her base offense level increased two levels pursuant to Section 2D1.1(b)(1).

These are legal arguments regarding *Bailey*'s effect.

Judge Riley stated that he was "of the opinion that the government did not establish enough underneath the new findings of the *Bailey* case to make the weapon includable as an enhancement in this case." Judge Riley's statement also indicates that his decision not to increase Besse's offense level by 2 points was based upon his interpretation of *Bailey*. Reviewed *de novo*, we think this conclusion was wrong.

In *Bailey*, the Supreme Court determined that under 18 U.S.C. § 924(c)(1), which specifies certain penalties if a defendant "during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm," the term "use" requires evidence sufficient to show "active employment" of the firearm by a defendant. Mere possession or placement of a gun to provide a sense of security or otherwise to facilitate the drug offense does not, the Court says, constitute "use" under § 924(c)(1).

Guideline § 2D1.1(b)(1) states that if "a dangerous weapon (including a firearm) was possessed, increase [the base offense level] by 2 levels." Application Note 3 states that

> [t]he adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet.

Besse argues that if possession of a weapon in close proximity to drugs does not demonstrate an intention to "use" the weapon in connection with a drug trafficking offense pursuant to *Bailey*, proximity alone also cannot equal possession of the weapon in probable connection with a drug trafficking crime under § 2D1.1(b)(1). Moreover, she argues that her situation is just like that in the application note—the rifle was found in the closet.[6]

■ We disagree with the district court's determination that the *Bailey* decision alters the interpretation and application of § 2D1.1(b)(1). *Bailey*'s discussion of "use" has no effect on the "possession" requirements of § 2D1.1(b)(1). In *Bailey*, the Supreme Court in fact distinguished between "use" and "possess," and, in dicta, specifically pointed out that meeting the threshold of

---

5. Although this would perhaps be cause for withdrawal of a plea agreement, Besse has never argued for withdrawal of her plea agreement based upon *Bailey*, and in fact indicated all along that she did not want to be considered in breach of it by raising the *Bailey* issue.

6. Of course, marijuana also was found in the closet, putting Besse's rifle in much closer prox-

imity to drugs than the authors of the application note likely contemplated. In addition, although Besse's plea agreement and the factual stipulation do not address the Beretta handgun, the government nevertheless could also use that firearm as a basis for the 2–point increase, provided, of course, that the preponderance of the evidence standard was met.

§ 2D1.1(b)(1) requires far less than § 924(c)(1):

> Had Congress intended possession alone to trigger liability under § 924(c)(1), it easily could have so provided. This obvious conclusion is supported by the frequent use of the term "possess" in the gun-crime statutes to describe prohibited gun-related conduct.
>
> . . . .
>
> While it is undeniable that the active-employment reading of "use" restricts the scope of § 924(c)(1), the Government often has other means available to charge offenders who mix guns and drugs. . . . § 2D1.1(b)(1) provides an enhancement for a person convicted of certain drug-trafficking offenses if a firearm was possessed during the offense.

*Bailey,* —— U.S. at ——, ——, 116 S.Ct. at 506, 509. *Bailey* makes clear that § 2D1.1(b)(1) casts a wider net than § 924(c). *United States v. Pollard,* 72 F.3d 66, 68 (7th Cir.1995). The guideline requires mere possession of the firearm, which Besse admits, and not the active employment that *Bailey* requires for use under § 924(c)(1). The weapons enhancement reflects the sentencing commission's general determination that the mere possession of weapons by drug traffickers increases the danger of violence. *United States v. Wetwattana,* 94 F.3d 280, 285 (7th Cir.1996). Nothing in § 2D1.1(b)(1) requires use or intention to use the weapon.

The Sixth Circuit, in analyzing whether *Bailey* has any application to § 2D1.1(b)(1), determined that *Bailey* does not control analysis of the guideline provision. *United States v. Elder,* 90 F.3d 1110, 1133 (6th Cir. 1996). The Fifth and Eighth Circuits also have rejected arguments similar to Besse's regarding *Bailey,* relegating the issue to mere footnotes. *United States v. Betz,* 82 F.3d 205, 210–11 n. 3 (8th Cir.1996); *United States v. Castillo,* 77 F.3d 1480, 1499 n. 34 (5th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 180, 136 L.Ed.2d 120, and —— U.S. ——, 117 S.Ct. 236, 136 L.Ed.2d 166 (1996).

We recently determined that application of a similar guidelines enhancement for possession of a weapon was not altered by *Bailey* and was justified by proximity of the firearm to drugs. U.S.S.G. § 2K2.1(b)(5) (emphasis added) allows a 4–level enhancement

> [i]f the defendant used or *possessed* any firearm . . . in connection with another felony offense; or *possessed* or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or *possessed* in connection with another felony offense. . . .

In *United States v. Patterson,* 97 F.3d 192 (7th Cir.1996), a fugitive who already had been tried and sentenced for drug and gun charges was caught with a handgun and three pounds of marijuana in the trunk of his car. Affirming the district court judge's imposition of the 4–level enhancement, we said the "gun had been possessed in the past as to defendant's drug offenses, and it was obviously still being possessed for that purpose as could be inferred by its proximity to three pounds of marijuana." *Patterson,* 97 F.3d at 196.

Proximity between the firearm and drugs is an appropriate test for determining whether the gun was *possessed* in connection with the drug offense and whether the offender has "mix[ed] guns and drugs." For instance, in another post-*Bailey* case, *United States v. Turner,* 93 F.3d 276 (7th Cir.1996), we upheld use of the § 2D1.1(b)(1) enhancement when a handgun was seized from a bedroom containing methamphetamine. Proximity, even post-*Bailey,* was enough to justify the enhancement for *possession* of a firearm. Any higher threshold would rise to the level of "use" or "carrying," which the Supreme Court clearly distinguished in *Bailey* as being distinct from "possession" under § 2D1.1(b)(1) of the guidelines.

We therefore REVERSE Besse's sentence and REMAND her case to Judge Riley for resentencing. Carmack's sentence is AFFIRMED.