**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Robert BROWN and Lemond Jenkins, Defendants–Appellants.**

Nos. 97–2351, 97–2374.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 5, 1997.

Decided Feb. 25, 1998.

Deirdre A. Durborow (argued), Office of the United States Attorney, Criminal Division, Fairview Heights, IL, for Plaintiff–Appellee.

Andrea L. Smith (argued), Office of the Federal Public Defender, East St. Louis, IL, for Defendant–Appellant Brown.

Kevin C. Curran (argued), Federal Public Defender, St. Louis, MO, for Defendant–Appellant Jenkins.

Before BAUER, RIPPLE, and DIANE P. WOOD, Circuit Judges.

BAUER, Circuit Judge.

Robert Brown and Lemond Jenkins appeal a jury verdict finding them guilty of three counts each of food stamp fraud. They argue that the district court erred in admitting into evidence audio tapes and summary exhibits, and erred in calculating the amount of "loss" for sentencing purposes. In addition, defendant Jenkins appeals the district court's refusal to give his requested "good faith" and entrapment instructions to the jury, as well as the court's refusal to reduce his sentence for playing a mitigating role pursuant to United States Sentencing Guideline ("U.S.S.G.") § 3B1.2. Defendant Brown appeals the gambling restriction placed upon him during his period of supervised release. For the reasons set forth below, we affirm.

BACKGROUND

Robert Brown was the owner and operator of two small grocery stores: the Grub Shop, in East St. Louis, Illinois, and the Yellow Store, in Centreville, Illinois. Brown's nephew, Lemond Jenkins, was listed on business

documents as the manager of both stores, but worked primarily at the Grub Shop. Both stores were authorized by the United States Department of Agriculture ("USDA") to participate in the Federal Food Stamp program.

In November of 1992, a joint investigation was initiated by the USDA and the Illinois Department of Revenue, Department of Criminal Investigation, based upon the suspicion that the stores were involved in excessive food stamp redemptions. The agent assigned to the case, Stephen Manley, attempted to make controlled food stamp sales for cash to determine if the stores were trafficking in food stamps. Agent Manley first attempted to make a controlled transaction using an undercover deputy sheriff at the Grub Shop, but Jenkins, working at that time, refused to exchange the stamps for cash. Manley then recruited a confidential informant to attempt controlled transactions. The confidential informant, Patches Holmes, succeeded in exchanging stamps for cash on six different occasions at the Grub Shop.[1] These transactions were recorded on tape and involved food stamp purchases of marked stamps by both Brown and Jenkins. Agent Manley listened to and surveilled each transaction as it occurred and photographed some of the transactions.

On August 21, 1996, Brown and Jenkins were charged by a grand jury with unauthorized acquisition of food stamps and conspiracy to unlawfully redeem food stamps, theft of government money, and bank fraud. They were charged with three counts each of knowingly acquiring food stamps in an unauthorized manner, in violation of 7 U.S.C. § 2024(b)(1), and with conspiracy.[2] A jury trial ensued.

At trial, the government introduced the audio tape recordings of the controlled transactions between Patches and both Brown and Jenkins. One tape was introduced for each of the six transactions. For each recording, Patches testified that he listened to the tape, that the tape truly and accurately recorded the conversation that occurred, that it was his initials written on the tape, and that the

tape was in the same condition as it was when he last saw it. Patches also identified the speakers on each tape. Defendants objected to the introduction of the tapes based on inadequate chain of custody, but their objection was overruled.

At trial, the government also introduced evidence of the total amount of food stamps redeemed by the defendants for the period of January 1989 through March 1993. The figure was in excess of $600,000 and the corresponding exhibits were admitted with no objection from the defendants.

Evidence of Brown's Illinois sales tax returns for the time period covering January 1989 to December 1992 was also introduced by the government over defendants' objections. These returns were later used by the probation office and the government as the basis for calculating "loss" under U.S.S.G. § 2F1.1. The government also introduced, again over defendants' objections, summary charts comparing the total amount of food stamps redeemed with the food sales amount claimed in the tax returns.

The jury found both defendants guilty of unlawful acquisition of food stamps. At sentencing, defendant Brown objected to the amount of "loss" under U.S.S.G. § 2F1.1 as found by the presentence report ("PSR"). The PSR recommended a loss amount of $427,965.00. This figure was based on deducting one-half of the food sales declared by Brown on his tax returns from the total amount of food stamps redeemed by the defendant over the period of the indictment. Brown argued that the tax returns he filed were estimates, and that he had "the concomitant tendency of a businessman to underreport sales and pay lower taxes." Brief for Brown at 13. Further, Brown argued at sentencing that the government's figure of food stamps redeemed over-represented the amount of actual food sales made, and that it is unreliable to use the tax returns to determine loss. Brown asserted that the court should calculate loss by taking twenty-five percent of the actual food stamps redeemed

---

1. The Yellow Store was destroyed by fire in the fall of 1992, and was therefore not home to any controlled transactions.

2. The government dismissed the conspiracy charge at trial.

during the conspiracy. The district court rejected both the government and defendant's asserted mode for calculating loss, and without stating the basis upon which it based its calculation, found the loss caused by defendant's fraudulent activities to be in excess of $315,000.

The court sentenced Brown to a term of 30 months imprisonment on each of the three counts, to be served concurrently, and a three year term of supervised release. The court ordered that as a term of his supervised release, Brown shall not engage in any gambling activities or frequent any gambling establishments. The PSR indicated that Brown was a compulsive gambler, gambling as much as $200 to $2,000 per week. Business ledgers showed his gambling losses to be $25,000 to $30,000.

As for Jenkins, the court sentenced him to 21 months imprisonment on each of the three counts, to be served concurrently, and a two year term of supervised release. Jenkins was also ordered to pay $100,000 in restitution. The court denied Jenkins' motion to reduce his sentence for playing a mitigating role under U.S.S.G. § 3B1.2, citing the fact that he was an active participant in the offense and in the conspiracy. His participation in three food stamp purchases, his position as store manager, and his withdrawal of funds from the bank for one of the undercover sales precluded him from convincingly arguing that he played a minor role in the conspiracy.

Brown and Jenkins now appeal their convictions and sentences. They argue that the district court erred in admitting both the tapes and the summary exhibits, and in calculating the amount of "loss" for sentencing purposes. In addition, Jenkins appeals the district court's refusal to give his requested "good faith" and entrapment instructions and the district court's denial of a mitigating role under U.S.S.G. § 3B1.2. Brown appeals the gambling restriction placed on him during his period of supervised release.

ANALYSIS

A. *Admission of Audio Tapes*

■ Appellants argue that the district court committed reversible error by allowing the admission of six audio tapes depicting the undercover sales of food stamps for cash. Specifically, appellants argue that the tapes were admitted without proof of a chain of custody. The government concedes that it failed to establish a chain of custody for the six tapes. However, it argues, and we agree, that such a mistake does not render the tapes inadmissible. We have held that lack of proof regarding a chain of custody does not render tapes inadmissible. *United States v. Craig*, 573 F.2d 455, 478 (7th Cir. 1977). In *Craig*, the defendant argued, *inter alia*, that because the government failed to establish a chain of custody, the tape recorded conversations of he and a co-schemer should not have been admitted into evidence. *Id.* at 477. We disagreed, stating that the purpose of the chain of custody requirement is to insure that the items offered into evidence are in substantially the same condition as they were at the time the proponent came into possession of the evidence. *Id.* at 478. We went on to note that "the purpose of the rule is served where, as here, a proper foundation demonstrating the accuracy and trustworthiness of the evidence is laid." *Id.*

We believe that just as the purpose of the chain of custody rule was served it *Craig*, so is it served here. The government laid a proper foundation for the admission of the tapes at trial. Before offering each tape into evidence, the government questioned Patches, the confidential informant, about the events that occurred during the undercover sales of food stamps to the appellants on each of the six different occasions. Patches testified that he listened to the tapes, that the tapes truly and accurately recorded the conversation that occurred, that his initials were written on each tape, and that the tapes were in the same condition as when he last saw them. Patches also identified the speakers on each tape.

■ Additionally, Agents Manley and Lienard testified to these same conversations. Agent Manley testified that he listened to the conversations on a wire transmitter as Patches conducted each sale of food stamps to the appellants. He testified that he listened to the conversations during each of the

six transactions, and that he personally saw the fourth transaction take place between Patches and Jenkins. In this circuit, the recollections of eyewitnesses to the events in question are sufficient to establish a foundation for the admission of tapes. *United States v. Carrasco*, 887 F.2d 794, 802 (7th Cir.1989) ("In the case of an original or a duplicate tape the government may establish a foundation for accuracy and truth of the tape through 'evidence of a chain of custody and by the correspondence between the tape's version of the events ... and the recollections of the eyewitnesses to those events; in this circuit, either variety of evidence can establish a tape's foundation.'") (quoting *United States v. Blakey*, 607 F.2d 779, 787 (7th Cir.1979)). *See also Stringel v. Methodist Hosp. of Indiana, Inc.*, 89 F.3d 415, 420 (7th Cir.1996) ("we have eschewed any formalistic approach to the admission of tape recordings or copies thereof."). That the tapes depicted conversations which occurred five years earlier is irrelevant; a sufficient foundation was laid for the admission of the tapes.

■ Appellants do not suggest that there was a break in the chain of custody; they do not try to establish any tampering or altering of the tapes, nor do they allege that the tapes did not adequately depict the conversations between themselves and Patches. They simply insinuate that "any person with a thousand dollar computer can easily alter a tape recording." Brief for Jenkins at 4. Merely raising the possibility (however hypothetical) of tampering is not sufficient to render evidence inadmissible. *United States v. Kelly*, 14 F.3d 1169, 1175 (7th Cir.1994). When chain of custody is in question but there is no evidence of any tampering, there is a presumption that a system of regularity accompanied the handling of the evidence if the exhibits are at all times within official custody. *United States v. Scott*, 19 F.3d 1238, 1245 (7th Cir.1994), *cert. denied*, 513 U.S. 857, 115 S.Ct. 163, 130 L.Ed.2d 101 (1994); *United States v. Boykins*, 9 F.3d 1278, 1285 (7th Cir.1993), *cert. denied*, — U.S. ——, 117 S.Ct. 1271, 137 L.Ed.2d 348 (1997). Furthermore, the possibility of a break in the chain of custody of evidence goes to the weight of the evidence, not its admissibility. *United States v. Williams*, 44 F.3d 614, 618 (7th Cir.1995); *Scott*, 19 F.3d at 1245. The district court was satisfied that the proper foundation was established for the admissibility of the tapes and so are we. On the basis of the record before us, we cannot say that the district court abused its discretion in admitting the tapes into evidence. *Scott*, 19 F.3d at 1245; *Boykins*, 9 F.3d at 1285.

### B. *Admission of Summary Exhibits*

■ Appellants argue that the district court erred in admitting summary exhibits containing comparisons of the total amount of food stamps redeemed during the period of the conspiracy with claimed food sales. The claimed food sales figure was taken from Brown's submitted Illinois tax returns. Because Brown alleges he was less than accurate in reporting his sales for tax purposes, he claims that the tax returns do not adequately list the total sales from both of his stores for the period in question, and that therefore the charts are inadmissible.

■ We review the trial court's decision to admit summary charts for an abuse of discretion. *United States v. Doerr*, 886 F.2d 944, 958 (7th Cir.1989). Appellants contend that the charts should have been excluded because they were based on unreliable and inaccurate information. We disagree. The evidence relied upon in comprising these summaries was the total amount of food stamps redeemed by Brown and the food sales claimed by Brown on his sales tax returns. These exhibits underlying the summaries were properly admitted into evidence, and without any objections from appellants. Because the evidence was properly admitted, it was entirely appropriate to use the material in preparing the summaries. *See United States v. Briscoe*, 896 F.2d 1476, 1495 (7th Cir.) (holding that in order to admit exhibits containing summaries, the information contained therein must be based on evidence that has been properly admitted), *cert. denied sub nom. Usman v. United States*, 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990).

■ Appellants assert that because Brown's tax returns were incomplete, they are unreliable and the charts relying upon them are inadmissible. We refuse to find that the district court abused its discretion in admitting summaries based on allegedly inaccurate, but properly admissible and unobjectionable, evidence. Whether the tax returns are accurate or not is not our concern. The appellants submitted them to the Illinois Department of Revenue, and did not object when the government offered them at trial. Appellants cannot now capitalize on their dishonesty by contending that they committed yet another felony. While we are certain the Department of Revenue appreciates their candor, appellants' confession will not inure to their benefit.

Further, Judge Stiehl provided the jury with a clarifying instruction. He advised the jury that it should consider the original materials upon which the exhibits were based to determine whether the summaries are accurate. Specifically, Judge Stiehl charged the jury as follows: "There have been admitted into evidence certain schedules, charts or summaries. Their accuracy has been challenged by the defendants. Thus the original materials upon which the exhibits are based have also been admitted into evidence so that you may determine whether the schedules or summaries are accurate." This instruction, together with the fact that the exhibits underlying the summaries were previously admitted into evidence, and without objection, lead us to conclude that the district court was within its discretion in admitting the summary charts into evidence.

### C. *Calculating the Amount of Loss for Purposes of U.S.S.G. § 2F1.1*

■ Appellants next contend that the district court failed to make specific findings on the record of how it determined "loss" for purposes of U.S.S.G. § 2F1.1. We review a district court's calculation of the amount of loss for clear error. *United States v. O'Brien,* 119 F.3d 523, 534 (7th Cir.1997); *United States v. Barnes,* 117 F.3d 328, 334 (7th Cir.1997). We review the district court's determination of the meaning of "loss" *de novo. Id.*

Under U.S.S.G. § 2F1.1(b)(1), a district court may increase the sentence of one who has violated 7 U.S.C. § 2024(b)(1) by eight levels if such offense resulted in a "loss" exceeding $200,000. "For purposes of [sec. 2F1.1(b)(1) ], the loss need not be determined with precision." U.S.S.G. § 2F1.1, Application Note 8. Rather, "[t]he [sentencing] court need only make a reasonable estimate of the loss, given the available information." *Id.*

We recently defined loss within the context of a conviction for food stamp fraud in *United States v. Barnes,* 117 F.3d 328, 334–35 (7th Cir.1997). In *Barnes,* we held that in calculating the amount of loss under § 2F1.1 for a stamp fraud case, "loss is the value of the benefits diverted from intended recipients or uses." *Barnes,* 117 F.3d at 335 (quoting U.S.S.G. § 2F1.1, Application Note 7(d)). We concluded that in the context of food stamp fraud, the amount of loss should equal the aggregated food stamp redemptions less actual food sales. *Id.* at 334–35.

In the case at hand, the government, in its PSR, recommended that the amount of loss should be $427,965. This figure was based on deducting fifty percent of the gross food sales obtained from Brown's tax returns from the total amount of food stamps redeemed. In contrast, defendants asserted that the loss should be $155,484. Defendants' figure was based on twenty-five percent of the food stamps redeemed during the conspiracy. Defendants argued that because a witness testified at trial that approximately three-quarters of all the sales she experienced were made by food stamps, only one-quarter of the total stamps redeemed could have been fraudulent. The district court accepted neither recommendation, and concluded that the amount of loss was in excess of $315,000.

Appellants argue that the court made three errors in arriving at the loss figure: (1) improperly relying on the Illinois sales tax returns; (2) not determining the amount of loss based on the testimony of a witness who estimated that three-quarters of all food sales at the Grub Shop were food stamp sales; and (3) not considering a "cash back" phenomenon, whereby customers purchase small items utilizing their food stamps and are given "cash back" from their purchases,

leaving more food stamps redeemed than actual food items sold. We disagree.

■ In arriving at its decision, the court listened to over two hours of testimony and actively questioned witnesses and counsel about the figures and methods being advanced. A court can consider whatever evidence is before it in arriving at the amount of loss. *United States v. Carmack*, 100 F.3d 1271, 1276 (7th Cir.1996) ("A sentencing judge may take any information into account in passing sentence so long as it has sufficient indicia of reliability to support its probable accuracy."). Clear error review means that we will not reverse the district court's decision unless after reviewing the entire record we are left with a definite and firm conviction that a mistake has been committed. *Id.* We do not have a definite or firm conviction that a mistake was made in this case. There is no evidence that the district court relied on the sales tax returns, nor is there any evidence it did not consider a cash back theory. In a similar vein, the court is allowed to judge the credibility of a witness on its own and we will not reverse the loss calculation based on one witness' testimony. *United States v. Golden*, 102 F.3d 936, 945 (7th Cir.1996) ("We will not reweigh evidence and evaluate the credibility of witnesses because these are tasks that lie outside our province.") (quotes and citation omitted); 18 U.S.C. § 3742(e) (in reviewing a sentence imposed under the guidelines, "the court of appeals shall give due regard to the opportunity of the district court to judge the credibility of witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous."). While we agree with the appellants that the district court could have been more specific in explaining its calculations, and we urge district court judges to do so, the record more than amply supports the court's conclusion that the loss was in excess of $315,000.

### D. *Jenkins' Proposed Jury Instructions*

■ Jenkins argues that the district court committed reversible error when it refused to give the jury his proposed "good faith" and entrapment instructions. A defendant is entitled to a jury instruction on his theory of defense if the defendant satisfies four requirements: (1) the proposed jury instruction is a correct statement of the law; (2) the theory of defense is supported by the evidence; (3) the theory of the defense is not part of the charge; and (4) the failure to include the instruction would deny the defendant a fair trial. *United States v. Douglas*, 818 F.2d 1317, 1320–21 (7th Cir.1987). Because there is no evidence to support any of these theories, we reject Jenkins' argument.

■ The record reveals that at no time did appellant object to what he now raises before this court. The parties submitted their proposed instructions to the court, each side argued its position, and the judge denied defendant's request for both instructions. After the court rejected its request, the appellant did not voice an objection. "A defendant must object to the judge's refusal to tender the defendant's instructions, and must clearly state the reasons for his objection." *United States v. Brown*, 739 F.2d 1136, 1143 (7th Cir.) (*citing United States v. Jackson*, 569 F.2d 1003, 1009–10 (7th Cir.), *cert. denied*, 437 U.S. 907, 98 S.Ct. 3096, 57 L.Ed.2d 1137 (1978)), *cert. denied sub nom. Kenngott v. United States*, 469 U.S. 933, 105 S.Ct. 331, 83 L.Ed.2d 268 (1984); Federal Rules of Criminal Procedure Rule 30 ("No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."). Therefore, we will reverse only if the alleged errors amount to prejudicial plain error. *Brown*, 739 F.2d at 1143.

### 1. "Good faith" instruction

■ Jenkins argues that the trial court's failure to give the jury a "good faith" instruction violated his fifth and sixth amendment rights, amounting to reversible error. Since the defendant's proffered instruction was not supported by the evidence in the record, the trial court's refusal to give it was not error. *United States v. Goulding*, 26 F.3d 656, 668 (7th Cir.), *cert. denied*, 513 U.S. 1061, 115 S.Ct. 673, 130 L.Ed.2d 605 (1994). A criminal defendant is not entitled to have his particular instruction presented to the jury;

rather, he is entitled only to have his theory of defense presented to the jury. *United States v. Boucher*, 796 F.2d 972, 975 (7th Cir.1986). The record reflects that Jenkins did not put forth a good faith defense theory at trial. That he put forth one at sentencing is to no avail. Jenkins never argued at trial that he acted in good faith, nor did he argue that he did not know it was illegal to sell food stamps.

Rather, the evidence adduced at trial leads to an opposite conclusion. Jenkins acted as more than a mere clerk at the Grub Shop; he was the manager. He ran the daily operations at the store, and had the authority to redeem food stamp certificates. He purchased food stamps on three different occasions from a confidential informant, and admitted to an agent assigned to the case that he bought food stamps. Food stamp regulations were posted in the store, and one store clerk testified that she believed Brown discussed the food stamp regulations with Jenkins. Thus with no evidentiary basis for his good faith defense, the district court's refusal to tender the instruction does not amount to error.

### 2. Entrapment instruction

■ There was similarly no prejudicial plain error involved when the district court refused to tender the defendant's proposed entrapment instruction. We review a district court's refusal to give an entrapment instruction *de novo*. *United States v. Jones*, 21 F.3d 165, 171 (7th Cir.1994) (citing cases). A court will tender an entrapment instruction if a defendant produces sufficient evidence upon which a rational jury could have inferred that he was entrapped into committing the crime charged. *Id.* A valid entrapment charge requires proof of two related elements: (1) government inducement of the crime; and (2) lack of predisposition on the part of the defendant to engage in criminal conduct. *Id.*

■ Appellant's argument focuses on a lack of predisposition. Appellant argues that the government's first unsuccessful sale of food stamps and the informant's admission that he used deceit to get the appellant to engage in illegal activity indicate that he was not predisposed to commit the crimes. We disagree. A showing of mere initial reluctance to enter into a transaction with a particular informant is insufficient to constitute a lack of predisposition. *United States v. Ortiz*, 5 F.3d 288, 291 (7th Cir.1993). Simply offering a defendant the opportunity to commit a crime does not necessitate an entrapment instruction. *Jacobson v. United States*, 503 U.S. 540, 549, 112 S.Ct. 1535, 1540–41, 118 L.Ed.2d 174 (1992). That is all that occurred in this case. Appellants were engaged in a scheme to sell food stamps, and the government was simply one of their customers. Jenkins failed to present sufficient evidence at trial to entitle him to assert an entrapment defense. Accordingly, we find that the court properly refused to instruct the jury on entrapment.[3]

### E. Minor Role Reduction

■ Jenkins also appeals the district court's refusal to grant him a minor role reduction pursuant to U.S.S.G. § 3B1.2. Jenkins argues that he is entitled to a two level departure because it was Brown who was the organizer and leader of this conspiracy, and Brown was the person who profited.

■ We review a sentencing court's decision to reduce an offense level for clear error. *United States v. Navarro*, 90 F.3d 1245, 1263 (7th Cir.1996). The defendant bears the burden of establishing "minor participant" status. *United States v. Soto*, 48 F.3d 1415, 1423 (7th Cir.1995). A defendant seeking to decrease his offense level must prove that he was substantially less culpable than other coconspirators. *Navarro*, 90 F.3d at 1263 (*citing United States v. Nobles*, 69 F.3d 172, 190 (7th Cir.1995)). As we have repeatedly held, the relevant inquiry is whether the defendant was a minor participant in the crime for which he was convicted, not whether he was a minor participant in some broader conspiracy that may have sur-

---

**3.** The entrapment analysis ends without inquiry into government inducement if the defendant was predisposed to commit the charged conduct.

*Jones*, 21 F.3d at 170; *United States v. Cervante*, 958 F.2d 175, 178 (7th Cir.1992).

rounded it. *United States v. Burnett,* 66 F.3d 137, 140 (7th Cir.1995).

Here, Jenkins was sentenced only for the specific conduct in which he was engaged: selling food stamps in violation of 7 U.S.C. § 2024(b)(1). It clearly cannot be said that he was a minor participant with respect to these actions. *See United States v. Lampkins,* 47 F.3d 175, 181 (7th Cir.) ("[I]t makes no sense that one is a minor participant in one's own conduct."), *cert. denied,* 514 U.S. 1089, 115 S.Ct. 1810, 131 L.Ed.2d 734 (1995). Jenkins was the manager of the Grub Shop, and made controlled purchases of food stamps on three different occasions. For one of these transactions, Jenkins left the Grub Shop and went to the bank to obtain cash to pay the confidential informant for the food stamps. The fact that Jenkins did not profit from his illegal actions is not our concern. *See United States v. Brick,* 905 F.2d 1092, 1095 (7th Cir.1990) (the importance of an individual's role should not be based solely on the amount of the individual's pecuniary gain). The sentencing guidelines note that the minor role adjustment should be used infrequently and reserved for only those defendants who are plainly among the least culpable involved in a group's criminal activity. *See* U.S.S.G. § 3B1.2, Notes 1 & 2; *United States v. Jarrett,* 133 F.3d 519 (7th Cir.1998). We agree with the district court that Jenkins is not one of those least culpable individuals.

## F. *Gambling Restrictions*

■ Brown argues that the gambling restrictions placed upon him by the district court are not reasonably related to his conviction for food stamp fraud, are a greater deprivation of liberty than reasonably necessary, and are unconstitutionally vague.

■ We defer to the district court's decision when it chooses to impose special conditions of supervised release and review those conditions under the deferential abuse of discretion standard. *United States v. Schechter,* 13 F.3d 1117, 1118 (7th Cir.1994); *United States v. Showalter,* 933 F.2d 573, 574 (7th Cir.1991). Here the district court ordered that Brown not engage in any gambling activities or frequent a gambling establishment

for the three year period of his supervised release. We do not believe Judge Stiehl abused his discretion in imposing this restriction. The record reflects that Brown admitted to being a compulsive gambler, that the ledgers confiscated from his stores indicated gambling losses of $25,000 to $30,000, and that the confidential informant testified about Brown's gambling habits. In imposing a sentence, a court can take into consideration the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). Additionally, a district court has broad discretion under the statutes and the sentencing guidelines in imposing terms of supervised release. See 18 U.S.C. §§ 3583(a) and (d); U.S.S.G. § 5D1.3. Given the evidence before the lower court, we do not believe it abused its discretion in imposing a gambling restriction on Brown.

## CONCLUSION

We conclude that the trial judge did not abuse his discretion in admitting the six audio tapes and summary charts into evidence, and that the court's calculation of the amount of loss was not clear error. Further, we find that the court properly refused to instruct the jury on Jenkins' requested good faith and entrapment instructions, and properly refused Jenkins' requested downward departure for minor participant status. Additionally, the court's imposition of gambling restrictions during Brown's period of supervised release was not an abuse of discretion. Accordingly, we AFFIRM the decision of the district court.