**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Leroy L. SCOTT, Jr., Defendant–
Appellant.**

**No. 93–1611.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 10, 1993.

Decided March 28, 1994.

Rehearing and Suggestion for Rehearing
En Banc Denied April 22, 1994.

Christopher T. Van Wagner (argued), Office of the U.S. Attorney, Madison, WI, for plaintiff-appellee.

Stephen J. Eisenberg (argued), Madison, WI, for defendant-appellant.

Before MANION, and KANNE, Circuit Judges, and WILL, District Judge.*

KANNE, Circuit Judge.

A series of tips led to a month long investigation by detective Richard Pharo of the Madison, Wisconsin police department culminating in the arrest of Leroy L. Scott on September 1, 1992. Scott was subsequently convicted of possessing cocaine base with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Scott now raises a variety of challenges to his conviction, and to his sentence.

In August of 1992, Pharo received four calls from informants which led to the investigation and arrest of Scott. Two of these informants were considered to be reliable, having provided information in the past.

Pharo's investigation began with an anonymous tip. The caller told him that a black male who drove a black Camaro with out of state plates was selling drugs out of an apartment at 237 North Thompson Drive, in Madison. The informant had seen many people coming and going from this apartment at all hours.

Pharo's next tip was from one of his reliable informants. This informant told Pharo that "a black man named Roy from Chicago" was living with a woman in the Meadows Apartments. The informant said Roy was involved in crack sales in Madison on the north and east sides of town. This informant was shown a jail photograph of Scott and identified him as "Roy."

The second reliable informant had a similar story. He also said that a black man from Chicago named Roy was selling drugs on the east side of Madison. He added that Roy had a black Camaro, a medium-blue sedan, a blue pick-up truck, and perhaps a black Mustang. Roy, the informant said, used these vehicles to deliver drugs to his "drug workers."

Pharo also received a call from a second anonymous tipster who mentioned a black man named Roy and implied that he was "involved" with people on the north side of Madison who were known by Pharo to be involved in illegal activity.

Pharo went to the Meadows Apartments, at 237 North Thompson Drive. He saw a black Camaro with Illinois plates. Pharo learned that the car was registered to Leroy Scott, of Chicago.

On August 26 Pharo worked with undercover officer Wayne Strong, who tried to purchase cocaine base from a suspect named Virgil Thomas. Thomas called a pager number, and received a call back. Thomas told Strong that they would have to drive to Roy's house to get the drugs.

They drove to 237 North Thompson Drive. On the way over Thomas complained to Strong that Roy had been away in Chicago for several days, and that Roy's absence cost him $3,000 in business. When they arrived at 237, Thomas told Strong that Roy was cautious and would not meet him. Thomas parked his car. A blue pick-up truck pulled up. Thomas got out and spoke to the person in the truck. The person in the truck got out and they walked together toward 237 North Thompson. Thomas came back with half an ounce of cocaine base.

Within a few days of the time that Strong purchased the cocaine base from Thomas and Roy, Pharo received a call from DEA agent Jerome Becka. Becka told Pharo that one of his informants had tried to purchase cocaine from Leroy Scott at 237 North Thompson Drive. This informant said that Scott had told him that he was expecting a "big load" of cocaine base.

On September 1, 1992 Pharo was notified that employees of the Quality Inn Motel had reported that they believed that one of the guests in the Motel was selling drugs. Pharo drove to the motel. Parked in the parking lot he saw the blue pickup truck from the August 26 crack purchase, and the black Camaro with an Illinois plate that he had seen at the Meadows Apartments. He looked into the cab of the pickup, and saw

* The Honorable Hubert L. Will, District Judge for the Northern District of Illinois, is sitting by designation.

several plastic bags with unknown contents and a microwave oven.

The motel employees told Pharo that a woman and a black man were staying in room 158, which was directly over the motel office. The woman paid the motel bill each night with a hundred dollar bill. The "do not disturb/no maid service" sign was left up at all times. From the office, the black man could be seen going to and from the blue pickup truck to the motel room several times an hour. Once, he was seen carrying a plastic bag of white powder, partially concealed behind a radio. Also, there was a large amount of foot traffic to and from room 158, through a side door.

The motel employees also saw visitors to room 158 leave in a car with Wisconsin license plate "CHILL 2." Pharo knew that Virgil Thomas was known as "Chill 2" and that the license plate was listed to Thomas' wife.

Pharo and other officers watched the two vehicles and waited. A black man went to the pickup, opened the side door, closed it, then got into the Camaro and drove away. Pharo and other officers followed. The man drove to 2003 Westbrook. He entered the house, then came back out with another man. The first man went to the Camaro, got a white plastic bag from the back seat, and the two men returned to the house.

Pharo had gotten a good look at the man they were following at this point. Having seen jail photographs of Scott, Pharo was "fairly certain" that it was him.

The man left the house carrying a white bag. He got into his car and drove away. As he left the neighborhood, Pharo ordered the officers with him stop the car. They boxed in the Camaro with their cars.

Pharo approached the Camaro from the passenger side. He showed the driver his badge and gun. Speaking through the open passenger-side window, he told the man to turn off the car and place his hands on the steering wheel. Another officer approached the car from the driver's side, and ordered the driver out. Pharo asked the driver his name and where he was from. He responded that he was Leroy Scott from Chicago.

Pharo then told Scott that he was under arrest, and took him into custody.

Pharo reached into the back seat and removed the white plastic bag Scott had carried with him when he went into the house at 2003 Westbrook. It contained a beaker, which contained a wet, white residue. Pharo recognized this as the residue from the process of cooking cocaine into crack.

Pharo then ordered Scott and his car to be taken to a nearby park, to get him out of public view. Pharo asked Scott what he was doing at the house on Westbrook. Scott said he was visiting a friend. Pharo then told Scott that he knew where Scott lived, that Scott had sold drugs to a cop, that he had been watching Scott at the motel and at the house on Westbrook, and that he had seen the microwave oven in the front of the blue pickup truck.

Meanwhile the other police were searching Scott's car. They found a Fix-a-Flat can in the trunk with a false bottom. In the can they found sixty grams of cocaine base.

Pharo then read Scott his Miranda rights. Scott indicated that he understood his rights, and that he was willing to talk to Pharo. Scott then said that he had not "cooked" cocaine at 2033 Westbrook, but had only "packaged" it there.

Pharo obtained a search warrant to search Scott's motel room, and it was searched that evening. There were six ounces of powder cocaine, in plastic bags, in the motel room.

A federal grand jury returned an indictment which charged Scott with possession of cocaine base with intent to distribute. Evidentiary hearings were begun before a magistrate judge on Scott's motion to suppress evidence and to quash his arrest. Scott presented several witnesses, including Cyndi Herbst, an employee from the Quality Inn.

Some days after the hearing concluded, the government moved to reopen the evidence, to allow Herbst to testify that she had been mistaken in some of her earlier testimony. Scott objected. The magistrate judge granted the motion to reopen. Scott appealed to the district court, which affirmed the order reopening the evidence. When the hearing

resumed, the government recalled Herbst and she testified, amending the statements she had made previously.

The magistrate judge filed a report which recommended that the district judge deny Scott's motion to quash his arrest, deny his motion to suppress the evidence found in his car and motel room, but grant in part Scott's motion to suppress his own statements. Over Scott's objection, the district judge adopted the magistrate's report and recommendations.

. Scott was tried before a jury, found guilty and sentenced to twelve years imprisonment, with five years of supervised release.

Scott now raises a variety of challenges to his conviction and sentence. We will examine each of these challenges.

*Probable Cause*

■ Scott claims that Pharo lacked probable cause to arrest him on September 1, 1992, and that the district court erred when it allowed the evidence resulting from his arrest to be used. Scott moved to suppress the evidence, and his motion was denied. We review the district court's decision on a motion to suppress evidence for clear error, which means that we will reverse only if we are firmly convinced that the district court has made a mistake. *United States v. Rice,* 995 F.2d 719 (7th Cir.1993).

■ There was no mistake. The district judge approved the magistrate's report, which correctly noted the law in this circuit regarding the requirements for a finding of probable cause. We held in *United States v. Burrell,* 963 F.2d 976, 986 (7th Cir.1992), that we assess the validity of a warrantless arrest in light of the "totality of the circumstances." We require that the arresting officer have knowledge of "reasonably trustworthy information ... sufficient to warrant a prudent person in believing that an offense had been committed." *Id.* The source of the information may be a tip from an informant, so long as the tip is shown to be reliable. Reliability may be shown by the informant's past record of reliability, or through independent confirmation or personal observation by the police, or by other methods. *Alabama v. White,* 496 U.S. 325, 331–32, 110 S.Ct. 2412, 2417, 110

L.Ed.2d 301 (1990); *United States v. Spears,* 965 F.2d 262, 272–73 (7th Cir.1992).

■ Herein, the court found that as of August 26, Pharo had information from two reliable informants which "pointed squarely at Scott." Before Scott's arrest, Pharo also was aware of Thomas' statements that "Roy" was the source of the crack he sold. Further, Pharo had observed the purchase of crack from "Roy" at an address known to be Scott's.

The court found further that on September 1, the date of Scott's arrest, there was an accumulation of incidents which supported the conclusion that Scott was involved in drug trafficking. For example, Pharo saw a microwave oven in the cab of Scott's truck. He had spoken to the Quality Inn employees about what they had seen. Pharo also saw Scott bring the bag into the house on Westbrook, and remain there for ninety minutes.

As the court correctly pointed out, "it is of no moment that most of the conduct on September 1, 1992 may have been unrelated to drug activity" because "what [the police officers] saw led them to believe, based on their training and experience, that Scott was engaged in drug transactions." In other words, taken in isolation, various specific pieces of evidence implicating Scott might be innocently explained away. But the police, properly, viewed his conduct as a whole. Doing so, they had probable cause to conclude that Scott was trafficking in illegal drugs.

■ To the extent that the court relied on credibility determinations of witness testimony when reaching its conclusions, we defer to those findings. The factfinder actually hearing the testimony of witnesses is best situated to determine their credibility. *United States v. Johnson,* 991 F.2d 1287, 1290 (7th Cir.1993).

The district court did not err in finding that there was probable cause to arrest Scott.

*Reopening of Evidence*

Scott objects to the decision to reopen the suppression hearing to allow Herbst to change her testimony. At the initial stage of the hearing, she claimed that she first spoke

to Pharo late in the afternoon on September 1. This contradicted other testimony that she spoke to Pharo before he and the other police officers followed Scott from the motel parking lot at 2:15 P.M. that day. In other words, if Herbst's initial testimony was correct concerning the time of day when she spoke to Pharo, then the police must have arrested Scott *before* talking to her. If true, Herbst's initial testimony meant that the police were inaccurate in their testimony about the investigation of Scott, and that they had a lesser basis for probable cause when they arrested him than they claimed. Herbst, having looked at her calendar in the interim following the commencement of the hearing, recanted her initial testimony given earlier and said that she had met with Pharo earlier in the day than she had originally stated.

In reopening the hearing, the magistrate judge stated that he had "an obligation to reopen a suppression hearing where a critical witness wishes to change his or her testimony on a potentially dispositive fact." He went on to say:

> [k]nowing that Herbst wishes to recant, I cannot pretend that [her] testimony as it exists in the record is trustworthy and accurate. It would be difficult for this court to find facts accurately knowing that a key witness now wishes to testify under oath that her testimony was incorrect ... the only way for me to establish whether or not to give credence to her testimony is to hear her reasons for wanting to change it now.

In fact, the magistrate judge noted that having heard Herbst's testimony initially he had "already concluded" that Herbst's testimony was "mistaken."

The court looked to *United States v. Duran*, 957 F.2d 499 (7th Cir.1992), finding that it "compelled" the reopening of the hearing. *Duran* is factually distinct from this case. In *Duran*, a motion to reopen a suppression hearing was denied. However, in *Duran* we noted that in a situation where a witness' "misconduct was of the type which directly called his credibility into question" then reopening a suppression hearing would be "required." *Id.* at 506.

The district judge in this case, when reviewing the magistrate's decision, searched for clear error. The district judge correctly applied this standard following 28 U.S.C. § 636(b)(1)(A), which authorizes the court to "reconsider any pretrial matter" which has been delegated to a magistrate "where it has been shown that the magistrate's order is clearly erroneous or contrary to law." The district judge found no error, nor do we.

■ In this case, it was not misconduct by Herbst which put her credibility into question. Rather it was her request to recant her earlier testimony combined with the magistrate judge's own assessment, having heard her testify initially, that she had made a mistake. These two factors called Herbst's "credibility directly into question" and were therefore a sufficient basis, following *Duran*, to reopen the suppression of evidence hearing.

Scott argues that the district court, when deciding whether or not to reopen the suppression hearing, should have applied the four part test set out in *United States v. Olson*, 846 F.2d 1103, 1112 (7th Cir.1988). However, the *Olson* test is used to evaluate whether or not to allow a *new trial* on the basis of newly discovered evidence. The *Olson* test is not relevant to this case. This is clearly demonstrated by the flexibility granted to the district court by 28 U.S.C. § 636(b), which allows the district judge to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." This is utterly unlike the binding effect a criminal verdict imposes on the court.

A criminal case, once it is over, may only be retried under extraordinary circumstances. A suppression of evidence hearing is an entirely different kind of proceeding. There is no analogy between a request for a new criminal trial and the reopening of a preliminary proceeding of the type in this case.

*Duran*, not *Olson*, set out the proper standard for reopening the suppression of evidence hearing in this case, and it was correctly applied. There was no error.

*Other Evidence Issues*

■ Before trial, Scott filed a motion in limine to prohibit the government from introducing evidence that Scott had engaged in any drug transactions prior to his arrest in this case on September 1. With some exceptions which need not concern us here, the motion was granted.

On the first day of trial, detective Pharo was asked by the government what he had said to Scott to elicit a particular response from Scott. Scott's counsel objected, to prevent any reference to the ongoing investigation of Scott before September 1. The objection was sustained. The question was rephrased, and Pharo responded that "I told him that I had been watching while he [was] ... at the motel, that I had followed him over to Westbrook and that I had other information of drug activity...." Scott's counsel objected, on the same grounds, and his objection was sustained. Scott's counsel moved for a mistrial, and the court reserved judgment. It then instructed the jury to disregard the question and answer.

The court heard argument on the mistrial motion the next day. The first two parts of Pharo's comment, that he had been watching Scott, and had followed him, were already in evidence. The final part, that Pharo "had other information of drug activity" was, the court decided, "inappropriate in view of the motion in limine" because "from this answer obviously the intent [was] that more would follow." However, the court concluded, there was no reason for a mistrial. The comment states nothing improper. As the district judge noted, obviously Pharo had information of drug activity, he had been a policeman for years, and had testified as an expert in drug-related matters. That left only the possibility of an improper implication arising from Pharo's comment.

The district court's analysis was correct. Any improper implication which Pharo's statement might have had was adequately addressed by the court's instruction to the jury to disregard it. We presume, as we must, that jurors follow such instructions. *United States v. Hanson,* 994 F.2d 403, 408 (7th Cir.1993).

The motion for a mistrial was properly denied.

■ Scott also objects to a hearsay ruling by the trial court. Pharo testified that he saw Scott enter the house on Westbrook carrying a white plastic bag. He also testified that he found a white plastic bag in Scott's car at the time Scott was arrested. However, he testified that he "learned that [Scott] had exited 2003 Westbrook and had entered the black Camaro and was carrying...." Here he was interrupted by a hearsay objection which was overruled. Pharo continued by saying that Scott was "carrying the black bag that had been carried in previously...."

Scott argues that because Pharo had not with his own eyes seen him exit the building, he was recounting what someone else had told him, so his comment was hearsay. That is correct. However, Scott's conclusion that this statement was so prejudicial as to require a mistrial is wrong. He argues that this comment "is the primary evidence linking Scott with the contents of the bag." But it isn't. The bag was in Scott's car when he was arrested, and it contained a beaker with cocaine base residue. That is the primary link. A secondary link is that Pharo had seen Scott go into the house with the bag.

Absent the hearsay comment, the inference a listener would make would lead to the same conclusion. Scott was carrying a white bag around on the first of September. He went into a house with it. He came out of the house and drove away. There was a white bag in his car when he was arrested. The obvious conclusion is that he had taken the bag out of the house with him. In light of this logical inference the admission of the hearsay comment was harmless.

Scott objects to the admission of various items seized from his car as demonstrative exhibits. Pharo testified regarding these items of physical evidence at trial. However, another police officer had removed them from the car, and Pharo first saw the items at the police station when they were being sealed as evidence.

Scott claims that because Pharo had no personal knowledge that the items marked as

evidence were the same ones taken from Scott's car, he could not lay the foundation for their admission into evidence. He so objected at trial, and was overruled. Scott now argues that there was no basis for the admission of this evidence, and that his conviction should be reversed.

In *United States v. Lott*, 854 F.2d 244, 250 (7th Cir.1988), we noted that physical exhibits may be admitted so long as they are in "substantially the same condition as when the crime was committed." We review the trial court's determination for abuse of discretion. In making this determination, the district court makes a "presumption of regularity," presuming that the government officials who had custody of the exhibits discharged their duties properly. Furthermore, the government does not need to prove a "perfect" chain of custody, and any gaps in the chain "go to the weight of the evidence and not its admissibility."

In this case there was at most a minor gap in the chain of custody. Several items of evidence were first seen by Pharo some minutes or hours after they were taken from Scott's car. He did not, therefore, have personal knowledge of the precise location and condition of those items. However, given the presumption of regularity, the court did not abuse its discretion in allowing Pharo at trial to testify that he had been told that the items had been taken from the car by another officer, and that he first saw them later.

Scott does not dispute that the items were his and were taken from his car and were in the same condition at trial as when they were seized. Nor does he seriously dispute the fact that if these items had been excluded they would not have changed the outcome of the case. Contrary to Scott's claim in this appeal, there was a basis for the admission of this physical evidence. Even if it had been error it would have been harmless.

*Jury Instructions*

The district court refused to provide the jury with two instructions proposed by Scott. He argues that the rejection of these two instructions was reversible error.

When we review a challenge to the sufficiency of jury instructions, we look to whether or not the "instructions as a whole were sufficient to inform the jury of the applicable law and the theory of the defense." *United States v. Rice*, 995 F.2d 719, 724 (7th Cir.1993) (citations omitted). We defer to the "substantial discretion" of the district court for the "specific wording" of the instructions, and in rejecting a proposed instruction, so long as the essential points are covered by the instructions given. *Id.*

The first proposed instruction was a "theory of the defense" instruction which read:

The defendant maintains that he was moving his belongings as well as the belongings of others from the apartment located at 237 N. Thompson #3. He further maintains that he had no knowledge that the fix-a-flat can located in the camaro contained cocaine base, nor was he aware that the white plastic bag contained a beaker with cocaine base residue.

The defendant maintains that he was only operating a motor vehicle that happened to have those items located within it and that those items were placed there by and belonged to someone else.

The district court, in rejecting the instruction stated that it was "more than a theory of defense", that it contained argument based on facts not in the record, and that it was redundant with the standard instructions.

In *Rice* we held that

a defendant is entitled to have the jury instructed on a theory of defense if (1) the defendant proposes a correct statement of the law; (2) the defendant's theory is supported by the evidence; (3) the defendant's theory of defense is not part of the charge; and (4) the failure to include an instruction on the defendant's theory would deny the defendant a fair trial.

*Id.* at 725. The instruction proposed by Scott is not a correct statement of the law, in part because it contains argument and facts which are not in the record and therefore is not "supported by the evidence." The district court properly refused to give his "theory of the defense" instruction to the jury.

1246

■ Scott's second proposed instruction was a "cautionary" instruction regarding the cocaine found in his motel room. The proposed instruction read thus:

You have heard evidence of acts of the defendant other than those charged in the indictment. Specifically you have heard evidence that cocaine was found in room 158 of the Quality Inn Motel. You may consider the evidence only in determining whether the defendant is guilty of the crime charged in the indictment. The cocaine found in room 158 is insufficient, without more, to convict the defendant of the offense charged in the indictment.

The district court rejected this instruction, stating that it inadequately addressed the items found in the standard Pattern Federal Criminal Jury Instruction of the Seventh Circuit, number 3.08, which is the instruction used to limit the scope of "other bad acts" evidence admitted under exceptions to Fed. R.Evid. 404(b).

Scott suggests that this instruction should also be subject to the same four part test used in *Rice*, and that it passes it. The government argues that this is actually a theory of the defense instruction, subject to the *Rice* test, and that it fails. Applying *Rice*, we conclude that at best the proposed instruction fails the third and fourth prongs. The jury was clearly told that they must find Scott knowingly possessed cocaine *base*. The evidence of the cocaine in the motel room was circumstantial evidence that Scott had manufactured cocaine base for distribution, and therefore knowingly possessed the cocaine base found in his car, and it was therefore admissible. So, the theory embodied in Scott's proposed instruction was already part of the charge and, assuming as we must that the jury followed its instructions, Scott received a fair trial.

The jury was properly instructed on this matter, and the district court made no error in denying Scott's "cautionary" instruction.

*Sentencing Issues*

Scott raises two challenges to his sentence. First, he claims that his prior reckless driving conviction should not have been used to enhance his sentence. Second, he claims

that the Sentencing Guidelines provisions applied to him are unconstitutional.

■ Scott was convicted of reckless driving in 1992. The conviction led to a one-year conditional discharge, with a 72 hour reporting requirement and a one year check date. The district court held that this was a "prior sentence" under § 4A1.2(c)(1), because the district court concluded that it was a non-supervisory form of probation. The district court did not err in reaching this conclusion, and it therefore correctly applied the sentencing guidelines.

Scott, finally, suggests that the guidelines are unconstitutional because the penalties for crack are greater than for powder cocaine. Scott notes that this argument previously has been rejected by this court. *United States v. Lawrence*, 951 F.2d 751 (7th Cir.1991). Following *Lawrence*, we also reject this claim.

Scott's conviction and sentence are AF-FIRMED.