In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1426

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

UDARA A. WANIGASINGHE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 95-CR-73—**Barbara B. Crabb**, *Chief Judge.*

ARGUED SEPTEMBER 25, 2008—DECIDED NOVEMBER 3, 2008

Before POSNER, FLAUM, and EVANS, *Circuit Judges*.

EVANS, *Circuit Judge*. In 1995, a grand jury sitting in the Western District of Wisconsin returned an indictment charging Udara A. Wanigasinghe with six counts of bank fraud. A warrant for his arrest was entered into the National Crime Information Center database on the day after the indictment was returned. Over 11 years later, on St. Patrick's Day in 2007, Wanigasinghe was arrested. He entered a guilty plea, was sentenced to four months of

imprisonment, and was ordered to pay $20,327 in restitution. He reserved his right to appeal the denial of his motion to dismiss the indictment, and his appeal is now before us. As could be predicted from the dates we have just mentioned, Wanigasinghe contends that the indictment should have been dismissed because his constitutional right to a speedy trial was violated.

But there's much more to this story than just the dates. Here, as Paul Harvey would say, is the rest of the story. Wanigasinghe grew up in Sri Lanka and came to the United States in 1990 to attend college at the University of Wisconsin-Eau Claire. He graduated in the spring of 1994 with a Bachelor of Arts degree in economics and marketing. He stayed in Eau Claire for nearly a year after graduation. But as the time for him to leave the United States neared, he executed a scheme to defraud six Wisconsin banks. The details of the scheme are unimportant to the issue before us. We will simply say that he deposited some $26,000 in forged checks into a series of bank accounts that he opened in his own name. He then withdrew as much of the money as the banks would allow. His plan was to skip the country before the fraud was discovered.

To do that, he deceived several people about where he was going. He told his girlfriend of four years that he had a job in Cincinnati and that he would send her his address once he got settled there. He wrote to his landlord that he had to leave immediately to take an internship in Singapore. He left separate checks for his April and May rent; one was returned for insufficient funds and the other because the account had been closed.

UW-Eau Claire had two addresses for Wanigasinghe—one in Eau Claire and the other at "778 Quarray Road, Jakarta, Singapore," a geographically challenged address what with Jakarta being the capitol of Indonesia, the fourth most heavily populated country on earth (its 2008 population is estimated to be over 235,000,000) and Singapore being a small (267 square mile) separate nation inhabited by fewer people than Wisconsin. Wanigasinghe also told Charter Bank that his address was Bloomer, a town of 92 residents in northern Minnesota, for which Wanigasinghe provided a Chicago zip code. His plan to escape prosecution worked until he returned to Wisconsin in 2007 and was arrested soon thereafter.

As we said, the district court denied Wanigasinghe's motion to dismiss the indictment. That determination involves a mixed question of law and fact. We review the legal conclusions *de novo* and the factual findings for clear error. *United States v. Stark*, 507 F.3d 512 (7th Cir. 2007).

Although common sense might indicate that a person who leaves the country to avoid prosecution should not be allowed to complain that he was not prosecuted quickly enough, the law, unfortunately, is not quite that simple. The government, though, argues that it is precisely that simple; that *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), makes clear that constitutional rights apply to persons found within the United States and do not extend to noncitizens beyond its borders. That is an oversimplification. *Verdugo-Urquidez* held that Fourth Amendment rights did not apply to a search and seizure by United States agents of property owned by a

nonresident alien and located in a foreign country. Other cases as well limit the reach of constitutional protections. For instance, *Johnson v. Eisentrager*, 339 U.S. 763 (1950), rejected the extension of the Fifth and Sixth Amendments to aliens beyond the borders of the Unites States. But recently, in *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), the Court found that Guantanamo Bay prisoners retained the constitutional privilege of seeking relief via habeas corpus. In reaching that conclusion, the Court traced the history of the Constitution's extraterritorial application, a history which we will not repeat but which cautions against broad pronouncements about whether the right to a speedy trial exists in Wanigasinghe's case.

In *Barker v. Wingo*, 407 U.S. 514, 522 (1972), the Court recognized the "amorphous quality" of the speedy trial right—or, put otherwise by the Court, that "the speedy trial right is . . . slippery." Consequently, the Court rejected bright line rules, one that would require a defendant to be brought to trial within a specified time period and another that would restrict consideration of the right to cases where a defendant had actually demanded a speedy trial.

Rather, in determining whether a defendant's speedy trial rights have been violated, we must balance a number of factors, including (1) the length of the delay, (2) whether "the government or the criminal defendant is more to blame for that delay," (3) the defendant's assertion of his speedy trial right, and (4) whether the defendant suffered prejudice as a result of the delay. *Doggett v. United States*, 505 U.S. 647, 651 (1992).

As we noted in *United States v. Oriedo*, 498 F.3d 593 (7th Cir. 2007), the length of the delay is the "triggering mecha-

nism"; that is, unless a presumptively prejudicial amount of time elapsed, it is unnecessary to conduct a searching analysis of all the factors. It goes without saying that the delay in this case—over 11 years—was indeed lengthy. So we must move on to the other steps.

The first question, then, is what was the reason for the delay and who was more to blame. At its most basic level, the reason for the delay is that Wanigasinghe left the country. But he contends that the government is at fault because it did not find him when he easily could have been found. He was living at his parental home in Columbo, Sri Lanka. He argues that UW-Eau Claire knew where he was so it would have been easy for the government to find him. This was a claim originally credited in the district court. Prior to the decision of the district judge (which we are reviewing) the magistrate judge had recommended granting Wanigasinghe's motion to dismiss the indictment based largely on his finding that the university, in fact, did know Wanigasinghe's whereabouts. To test that finding, the district judge reopened an evidentiary hearing, a procedure to which Wanigasinghe also objects, an objection we reject. It was not an abuse of discretion to reopen the hearing nor to admit evidence Wanigasinghe sought to have excluded.[1]

At the hearing, the claim that the university knew where Wanigasinghe was living was undermined. Wanigasinghe

---

[1] The evidence included certified, sworn grand jury testimony and exhibits identified in connection with that grand jury testimony.

claimed that "at some time" the university sent him a transcript. It was explained, however, that a transcript can be sent to any designated address—a work address, a home address, etc., not necessarily the address in the university's computer system. The testimony was that the only address in the university system for Wanigasinghe between September 1994 and May 2006 was the false "Jakarta, Singapore" address. After reviewing the evidence, the district judge rejected the notion that the university knew where Wanigasinghe was and that therefore the government could easily have found him. The finding is not clearly erroneous and favors a conclusion that Wanigasinghe is more responsible for the delay than the government.

As for the government's role during the time Wanigasinghe was out of the country, a warrant for his arrest remained active in the National Crime Information Center until he was arrested soon after arriving here in 2007. That fact distinguishes his case from *Doggett* in an important respect. Doggett was out of the country for two of the eight and one-half years between his indictment and his arrest. The remaining time he was in Virginia; he married, earned a college degree, had a steady job as a computer operations manager, and lived under his own name. The Court—although counting the two and one-half years Doggett was out of the country as part of the "triggering" delay—said that he could have been brought to trial *six* years earlier but for the government's "inexcusable oversights." Presumably, those six years are the years he lived in Virginia after his return to this country and during which the government did not find

him. In contrast, Wanigasinghe was brought to court almost immediately upon his arrival back in the country. In addition, there is absolutely no hint that the government was delaying its case to gain any sort of tactical advantage over Wanigasinghe. In short, it is Wanigasinghe himself who bears the responsibility for the delay. Delay is pretty clearly what he wanted. *See also United States v. Arceo*, 535 F.3d 679 (7th Cir. 2008).

We next consider prejudice to Wanigasinghe caused by the delay. Prejudice includes, as we noted in *Oriedo*, difficulties in defending a stale case, but also interference during the delay with a defendant's liberty, disruption to his employment, public humiliation, and the creation of anxiety for him, his family, and his friends. Wanigasinghe, of course, did not endure any loss of liberty or employment. We have no evidence that he suffered anxiety because of the charges hanging over his head, and if he did, he could easily have turned himself in to resolve the matter. As to the difficulties in defending a case, a long delay can give rise to a presumption of prejudice. But here, the district court's findings on the point are not erroneous. The judge found that the evidence in the case would in all likelihood be documentary, including the cards used to open bank accounts, the checks he wrote and deposited, and the bank records. The judge also correctly surmised that Wanigasinghe's best defense would be that the handwriting was not his. The passage of time would not impair his ability to find a handwriting expert.

As to the remaining factor, Wanigasinghe did not request a speedy trial during the time he was out of the

country. We agree with the district court's finding that he likely knew he had been charged with a crime but nevertheless did nothing to take care of the charges; quite the opposite. His failure to request a speedy trial is also a factor which weighs against him.

In short, the denial of Wanigasinghe's speedy trial claim is supported by the law and the evidence.

For all of these reasons, the judgment of the district court is AFFIRMED.