In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-2480

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MODESTO OZUNA,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 757—**John F. Grady**, *Judge.*

ARGUED DECEMBER 10, 2008—DECIDED APRIL 6, 2009

Before POSNER, KANNE, and ROVNER, *Circuit Judges*.

KANNE, *Circuit Judge.* On July 28, 2003, agents of the Drug Enforcement Agency stopped a tractor-trailer driven by Modesto Ozuna. After searching the trailer, allegedly pursuant to Ozuna's consent, the agents found 200 kilograms of cocaine. Ozuna was later arrested and indicted for possession with the intent to distribute more than five kilograms of cocaine. The district court initially suppressed the evidence from the search because the government had failed to prove by a preponderance

of the evidence that Ozuna consented to the search. It later reopened the suppression hearing to consider the testimony of two handwriting experts regarding whether a signature on the consent form belonged to Ozuna. Based on this new evidence, the court vacated its prior order and found the evidence admissible. Ozuna appeals the district court's decision to reopen the suppression hearing and its reliance on the government's handwriting expert. He also appeals the district court's decision to exclude certain testimony he wished to present at trial. We now affirm.

## I. BACKGROUND

In July 2003, Agent Michael Lumpkin of the Drug Enforcement Agency informed DEA agents in Chicago that two drug distributors, Claudio Aguilar and Mario Garcia, were orchestrating a drug exchange in the Chicago area using a tractor-trailer registered to "Ozuna's Express." On July 28, the Chicago agents pulled over Modesto Ozuna, who was driving a tractor-trailer bearing the name "Ozuna's Express." A search of the trailer, purportedly pursuant to Ozuna's consent, revealed 200 kilograms of cocaine hidden among a load of limes.

Ozuna was taken to a DEA office, where, according to agents, he admitted that he was transporting illegal drugs. Ozuna told the agents that he wished to cooperate against Aguilar, so he was allowed to return to Texas for that purpose. Ozuna was released but was arrested again in August 2004. He was subsequently indicted

for possession with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1).

During the proceedings that followed, the government and Ozuna recited different versions of the events surrounding Ozuna's apprehension and arrest. Disagreement regarding these facts led to a number of evidentiary challenges that have become the subject of this appeal.

### A. Ozuna's Motions to Suppress the Seized Cocaine

On January 12, 2005, Ozuna filed a motion to suppress the 200 kilograms of cocaine seized from his vehicle, arguing that he did not consent to the trailer's search.[1] On March 2, 2005, the court held a suppression hearing, at which DEA Special Agent Robert Glynn and Ozuna both testified as to their recollections of the search on July 28, 2003.

Glynn testified that, pursuant to information received from Lumpkin, he and other agents began surveillance of Aguilar and Garcia at O'Hare airport. Agents watched Aguilar and Garcia drive to a hotel, where they also saw Ozuna, who was driving a tractor-trailer. Based upon what they witnessed and information received from Agent Lumpkin, the agents stopped Ozuna's tractor-trailer.

---

[1] Ozuna also argued that the agents lacked reasonable suspicion to stop the tractor-trailer and that his stop resulted in an arrest without probable cause, but only the question of his consent is relevant to this appeal.

Glynn and Task Force Officer William McKenna approached the driver's door of the vehicle. According to Glynn, he asked for Ozuna's consent to search the trailer, and Ozuna agreed. Ozuna told the agents that the trailer was locked, and Glynn permitted him to retrieve the key from the cab. Ozuna then unlocked the trailer door.

Glynn testified that he retrieved a DEA consent-to-search form from his car and read it to Ozuna. Ozuna signed the form, which Glynn and McKenna also signed as witnesses. The agents searched the trailer and discovered the cocaine. They then took Ozuna to the DEA office in Chicago.

Ozuna disputed much of Glynn's testimony. He stated that on July 28, he drove a tractor-trailer loaded with mangoes and limes from Texas to Chicago. He claimed that the agents cut him off while he was driving, pointed a weapon at his head, demanded that he exit the truck, and handcuffed him. Ozuna maintained that he never gave the agents consent to search the tractor-trailer, did not retrieve the keys from the tractor or unlock the trailer, and did not sign the consent-to-search form. He denied knowledge of the cocaine found in the trailer.

At the close of the suppression hearing, the district court granted Ozuna's motion to suppress. After ruling that the DEA was justified in stopping the tractor-trailer, the court held that the government had failed to prove by a preponderance of the evidence that Ozuna voluntarily consented to the search of the trailer. Upon comparing the signature on the consent form to Ozuna's

known signatures, the court was not convinced that Ozuna had actually signed the form. It also expressed doubt regarding portions of Glynn's testimony, due to the serious risks the agents would have faced had the search occurred as Glynn described. Ultimately the court determined that, although it was a close question, it was not persuaded by the greater weight of the evidence that the government's version of events was true, and it granted the motion.

Following the hearing, the government submitted the consent-to-search form for fingerprint and handwriting analysis. Ozuna's fingerprints were not on the form, but a handwriting expert concluded that the signature was Ozuna's. On March 14, 2005, the government filed a motion to reconsider or supplement the suppression hearing with additional testimony from its handwriting expert. The district court denied the motion to reconsider and requested a response from Ozuna regarding the motion to supplement the hearing. In response, Ozuna argued that the additional testimony would not relate to the issue of whether the search was consensual, and that if the hearing were reopened, it would be prejudicial to allow the testimony of the government's handwriting expert without appointing an impartial handwriting expert to conduct an independent review of the evidence. He later filed an additional objection to the government's use of expert handwriting testimony on the ground that it did not meet the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The court granted Ozuna leave to hire an expert and conducted hearings to consider the testimony of both handwriting experts.

The defense expert, Ellen Schuetzner, explained that there were several inconsistencies and "voids" within the pen strokes that could indicate forgery. She had not, however, examined the document prior to its treatment for fingerprint analysis, and she noted that the chemical treatment or a faulty pen could also have resulted in these inconsistencies. After comparing and contrasting the questioned signature and known signatures, Schuetzner concluded that there were "indications" Ozuna may have signed the form, which she described as a "very weak opinion of authorship."

James Regent, the prosecution's expert, testified that he had concluded with his "highest degree of confidence" that Ozuna had signed the questioned document. He explained that the writing appeared natural, that he did not find evidence of simulation, and that all dissimilarities between the questioned and known signatures were within the expected range of variation.

On June 24, 2005, the court vacated its prior ruling and denied Ozuna's motion to suppress. The court explained that it gave little credence to Regent's conclusion that Ozuna had in fact signed the form. Instead, the court found the testimony of both witnesses useful in conducting its own evaluation of the signatures. After examining the questioned and known signatures, the court concluded by a preponderance of the evidence that Ozuna had signed the consent-to-search form. Based on this conclusion, the court found Ozuna's testimony to the contrary untruthful. Because of the court's adverse determination regarding Ozuna's credibility, it found, not-

withstanding its previous reservations, that Glynn's testimony regarding the search was more likely true than not and held that Ozuna had consented to the search.

On January 12, 2006, Ozuna filed a motion to reconsider the denial of his motion to suppress. In this motion, Ozuna argued that he had new evidence that would support his testimony and discredit that of Agent Glynn. He also maintained that the court's reliance on handwriting testimony was improper. The court held another hearing to consider additional evidence regarding the search, but it ultimately denied Ozuna's motion.

### B. Ozuna's First Trial

Ozuna's first trial took place from August 7 to August 10, 2006. Among numerous witnesses, the government called Agent Lumpkin, who testified about his contacts with the Chicago-based DEA agents and his interactions with Ozuna after he was released to cooperate with the government. Lumpkin described his efforts to locate Ozuna after he fled prosecution, as well as Ozuna's subsequent arrest and confession.

Ozuna called his ex-girlfriend, Oney Rios, and her sister, Jessica Rios, to testify about their contacts with Agent Lumpkin. Both Rios sisters claimed that Lumpkin had called them to ask about Ozuna and made various threats when he believed they were being uncooperative. For example, Oney testified that Lumpkin had asked her to lie, threatened to charge her with crimes related to the 200 kilograms of cocaine, and asked her if she wanted

to spend the rest of her life in jail. Jessica stated that Lumpkin had threatened to tell her employer of her former career as a "dancer at night."

During the government's rebuttal case, Lumpkin testified that he had contacted both Rios sisters during his pursuit of Ozuna. He stated that he had agreed to help Oney Rios with a felony warrant that was out for her arrest and admitted to having heated words with her when she was uncooperative. He denied, however, making any improper threats.

On August 11, 2008, the court declared a mistrial after the jury was unable to reach a unanimous verdict.

### C.  Ozuna's Second Trial

Ozuna's second trial took place from November 2 through November 9, 2006. At this trial, the government narrowed the focus of its case-in-chief. The government called numerous witnesses who testified to the surveillance conducted on July 28, 2003, the stop and search of Ozuna's truck, the discovery of the cocaine, and Ozuna's confession and decision to cooperate with the DEA. However, it did not call Agent Lumpkin and did not present evidence about Ozuna's flight from prosecution or his confession at the time of his arrest a year later.

During the defense's case-in-chief, Ozuna sought to introduce numerous pieces of evidence that he claimed were relevant to the credibility of the agents involved in the investigation and the government's case. These in-

cluded (1) testimony regarding Lumpkin's contacts with the Rios sisters; (2) questioning regarding the alleged fabrication of a DEA-6 form[2] memorializing Lumpkin's discussion with Jessica Rios; (3) testimony from Andreas Macias, whose previous identification of Ozuna the defense claimed the government falsified; and (4) Lumpkin's testimony from a previous proceeding regarding his interactions with truck drivers carrying cocaine. The defense argued that this evidence was necessary to support its theory that the government was attempting to convict Ozuna at any cost. The district court refused to admit this evidence based on Federal Rule of Evidence 403 and because it was irrelevant.

On November 9, 2006, the jury found Ozuna guilty. He was sentenced to twenty-five years' imprisonment, followed by five years of supervised release.

## II. ANALYSIS

The issues Ozuna raises on appeal fall into two categories. First, Ozuna asserts that the district court erred by considering the handwriting experts' testimony and subsequently denying Ozuna's motion to suppress the seized cocaine. Second, Ozuna argues that the district court improperly excluded evidence that he claims was necessary to present his theory of defense. We discuss each issue in turn.

---

[2] Although the parties do not define or explain a "DEA-6" form, it is apparently a report in which agents memorialize their interviews during an investigation.

*A. Consideration of the Handwriting Evidence and the Motion to Suppress the Seized Cocaine*

Ozuna challenges the district court's decision to deny his motion to suppress after considering expert hand-writing testimony. He first argues that the district court erred in reopening the suppression hearing and allowing the government to present new evidence that was available to it at the time of the original hearing. Next, he claims that the district court erred in failing to conduct a *Daubert* analysis. Because he maintains that handwriting comparison techniques are not sufficiently reliable, he argues that the district court should not have considered the expert testimony at the hearing.

*1. Reopening the Suppression Hearing*

This court has generally given wide latitude to district courts to reopen suppression hearings for consideration of newly obtained evidence. *See, e.g.*, *United States v. Scott*, 19 F.3d 1238, 1243 (7th Cir. 1994); *United States v. Duran*, 957 F.2d 499, 505-06 (7th Cir. 1992). Ozuna claims that this same latitude is not warranted where the evidence was available at the time of the previous hearing. In fact, he argues that the government should never be allowed to supplement a suppression hearing unless the evidence is newly acquired. He asserts that because the government could have subjected the document to handwriting analysis prior to the first hearing, it should not have been allowed to present this evidence at the second hearing. We find this argument unpersuasive.

As we have previously recognized, society has a strong interest in admitting all relevant evidence. *United States v. Regilio*, 669 F.2d 1169, 1177 (7th Cir. 1981). Thus, a defendant is entitled to suppression only in cases of constitutional violations, and the district court remains free throughout the trial to reconsider its previous orders suppressing evidence. *Id.* Because of society's interest, we have never required the government to justify a request for reconsideration of a prior ruling. *See id.*; *see also United States v. Bayless*, 201 F.3d 116, 131 (2d Cir. 2000) (opining that the Seventh Circuit has rejected "a rule requiring the government . . . to proffer a justification for its failure to present the relevant evidence at the original suppression hearing"). We now likewise decline to impose a justification requirement to reopen a suppression hearing. Instead, we hold that this decision lies within the sound discretion of the district court.

We are not the only circuit to reach this conclusion. *See In re Terrorist Bombings of the U.S. Embassies in E. Afr.*, 552 F.3d 177, 196 (2d Cir. 2008); *see also United States v. Rabb*, 752 F.2d 1320, 1323 (9th Cir. 1984) (citing *Reglio* with approval and holding that "[a] criminal defendant acquires no personal right of redress in suppressed evidence"), *abrogated on other grounds by Bourjaily v. United States*, 483 U.S. 171 (1987). For example, the Second Circuit has held that "on a motion to reopen a suppression hearing, there is no bright-line rule that necessarily and invariably requires the government to provide a reasonable justification for its failure to offer relevant evidence at an earlier suppression proceeding." *In re Terrorist Bombings*, 552 F.3d at 196. Because of the policy

favoring introduction of lawfully obtained evidence, the Second Circuit stated that " 'vague notions of unfairness . . . ought not [to] control.' " *Id.* (second alteration in original) (quoting *Bayless*, 201 F.3d at 132). Instead, the court noted that the government's justification for the delay was merely one factor to consider, leaving the ultimate determination to the discretion of the district court. *Id.* at 196-97.

Several of our sister circuits have, however, adopted rules requiring the government to justify reconsidering, reopening, or supplementing suppression hearings. *See, e.g.*, *United States v. Dickerson*, 166 F.3d 667, 679 (4th Cir. 1999), *rev'd on other grounds*, 530 U.S. 428 (2000); *United States v. Villabona-Garnica*, 63 F.3d 1051, 1055 (11th Cir. 1995); *McRae v. United States*, 420 F.2d 1283, 1288 (D.C. Cir. 1969). These circuits most often cite justifications of judicial economy and a desire to avoid "piecemeal litigation." *See Dickerson*, 166 F.3d at 679; *see also McRae*, 420 F.2d at 1288 (noting that "[t]o allow the loser at a pretrial suppression hearing to demand a de novo determination at trial" would defeat the purposes of promoting judicial efficiency and ensuring that trials not be interrupted or delayed). Rather than cite these cases, Ozuna points to concerns about fairness, noting that "repeated litigation imposes on the defense the impossible burden of conducting multiple hearings with limited resources."

These policy concerns are justified, but we do not believe that a bright-line rule is the sole way to protect them. By leaving the matter to the district court's discretion, the court remains free to refuse to reopen the sup-

pression hearing or to decline to consider the government's evidence if the government is wasting judicial resources or proceeding in a way that is unfair to the defendant. At the same time, adopting a more flexible approach protects society's interest in ensuring a complete proceeding where the court considers all relevant, constitutionally obtained evidence. Thus, "a district court should be permitted, in the exercise of its discretion and in light of the totality of the circumstances, to determine whether its suppression ruling should stand." *In re Terrorist Bombings*, 552 F.3d at 197.

Having determined that a district court may, in its discretion, reopen a suppression hearing even where the evidence was previously available, we consider whether the district court's decision to do so in this case was proper. Although this court has not articulated a standard by which we review a district court's decision to reopen a suppression hearing and reconsider a prior ruling,[3] we believe it is clear from the preceding analysis that our review is for abuse of discretion.[4]

---

[3] We have previously ruled on this issue but have never declared the applicable standard of review. *See, e.g.*, *Scott*, 19 F.3d at 1243; *Duran*, 957 F.2d at 505-06. We have, however, applied an abuse of discretion standard to reopen a hearing where the district court had not yet ruled on the issue. *United States v. Wanigasinghe*, 545 F.3d 595, 598 (7th Cir. 2008).

[4] Ozuna argues that because our analysis does not require the determination of underlying facts, review should be *de novo*. This argument is meritless. The district court's decision to

(continued...)

The district court did not abuse its discretion in reopening the suppression hearing and considering the handwriting testimony. We have noted that reopening a suppression hearing may be appropriate when the proffered evidence calls the credibility of a witness into question. *See Scott*, 19 F.3d at 1243; *Duran*, 957 F.2d at 506. In this case, the handwriting comparison testimony had a direct bearing on Ozuna's credibility. If this testimony showed that he had, in fact, signed the consent form, it would mean that he had perjured himself at the previous hearing. This information would assist the district court in determining whose version of the search to believe, resulting in a more accurate ruling on the motion to suppress.

Furthermore, there is no evidence that the government was engaged in a deliberate strategy to proceed in a piecemeal fashion or otherwise waste judicial resources. It does not appear from the record that the signature was clearly at issue until the first suppression hearing. Only then did the court express its doubts regarding its authenticity. After noting that this was a close issue, the court determined that the government had not met its burden of proof. The government then responded by requesting handwriting and fingerprint analyses. This

---

[4] (...continued)
reopen the suppression hearing involved questions of whether evidence was relevant to a witness's credibility. Such decisions are clearly factual rather than legal, rendering *de novo* review inappropriate. *See United States v. Hernandez-Rivas*, 513 F.3d 753, 758 (7th Cir. 2008).

was an entirely reasonable course of action given the court's ruling.

Finally, we note that Ozuna has not convinced us that he was harmed in any way by the fact that the handwriting testimony was presented at the second, rather than the first, suppression hearing. Ozuna argues that repeated litigation imposes the "impossible burden" on the defense of conducting multiple hearings with limited resources. But the court's decision to reopen the hearing did not prevent Ozuna from presenting any evidence or making any arguments. Indeed, he called his own handwriting expert, and his counsel extensively cross-examined the government's witness. Although the document was damaged by the government's fingerprinting analysis before Ozuna's handwriting expert could examine it, this was not a result of reopening the suppression hearing. Had the government presented the evidence at the first suppression hearing, the document still would have been subjected to chemical treatment before it was turned over to Ozuna. Given these considerations, the district court did not abuse its discretion in reopening the suppression hearing.

### 2. *Failure to Conduct a* Daubert *Analysis*

Ozuna claims that even if reopening the suppression hearing was proper, the district court erred by failing to conduct a *Daubert* analysis prior to considering the handwriting testimony. In *Daubert*, the Supreme Court held that it was the duty of the trial judge to examine expert evidence before trial to "ensure that any and all scientific

testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589. Thus, the district court serves a "gatekeeping" function to prevent expert testimony from carrying more weight with the jury than it deserves. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000); *see also Daubert*, 509 U.S. at 595 ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." (quotations omitted)).

Ozuna argues that *Daubert* applies with full force in suppression hearings, just as it does in trials, but he cites no law that effectively supports this contention. In fact, he concedes that the Rules of Evidence do not apply at pre-trial admissibility hearings. *See United States v. Matlock*, 415 U.S. 164, 172-73 (1974); *United States v. Severson*, 49 F.3d 268, 271 n.2 (7th Cir. 1995). Rule 104(a) makes this explicit. When ruling on admissibility, a district court judge "is not bound by the rules of evidence except those with respect to privileges." Fed. R. Evid. 104(a). We see no persuasive reason to disregard the Rules of Evidence and impose a new requirement on district court judges to conduct a *Daubert* analysis during suppression hearings.

The only case Ozuna cites in support of his argument is *United States v. Posado*, 57 F.3d 428 (5th Cir. 1995). There, the district court had applied a *per se* rule against considering polygraph evidence at any time, including a suppression hearing. *Id.* at 432. The Fifth Circuit reversed, holding that a *per se* rule against admissibility was no longer viable after the Supreme Court's decision in *Daubert*. *Id.* at 433. But no language in *Posado* supports

the argument that a district court *must* conduct a *Daubert* analysis at a pre-trial suppression hearing. The Fifth Circuit merely held that district courts could not be *prohibited* from considering that evidence or assessing its reliability. *See id.* In fact, the court noted that the Rules of Evidence are relaxed in a suppression hearing because "[a] district court judge is much less likely than a lay jury to be intimidated by claims of scientific validity into assigning an inappropriate evidentiary value to [scientific] evidence." *Id.* at 435.

In other words, the primary rationale behind *Daubert* is not applicable in a suppression hearing. The purpose of *Daubert* was to require courts to serve as gatekeepers so that unreliable expert testimony does not carry too much weight with the jury. *Smith*, 215 F.3d at 718. Judges, on the other hand, are less likely to be swayed by experts with insufficient qualifications. *Posado*, 57 F.3d at 435; *see also In re Salem*, 465 F.3d 767, 776-77 (7th Cir. 2006) (upholding a bankruptcy court's finding that "[t]he gatekeeping function that *Daubert* talks about is most pointedly at issue in a jury trial where a jury might be misled by an expert who doesn't have sufficient qualifications" (quotations omitted)). For this reason, we have held that a court conducting a bench trial could make reliability determinations as the evidence was presented throughout the trial, rather than during a formal pre-trial *Daubert* hearing. *In re Salem*, 465 F.3d at 777. Nothing in the Rules of Evidence or our case law prohibits a judge from taking a similar course of action during a suppression hearing.

Because the district court was not required to conduct a *Daubert* hearing, we review its consideration of the expert testimony for an abuse of discretion. *Cf. Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 505 (7th Cir. 2003) ("[I]f the district court properly applied *Daubert*, we review the court's decision to admit or exclude expert testimony only for an abuse of discretion." (quotations omitted)). The district court in this case carefully considered the handwriting testimony. It chose to credit some of the experts' analyses and discredit certain conclusions that it found unconvincing. It then used the expert testimony to guide its own analysis and determine whether Ozuna had signed the consent form. This was a reasonable use of the district court's discretion, and the decision to admit the seized cocaine was proper.

### B.   The Exclusion of Ozuna's Proffered Evidence

As another basis for his appeal, Ozuna claims that the court's decision to exclude several pieces of evidence undermined his ability to present his theory of defense. Ozuna maintains that most of this evidence was relevant to show that the government would go to "any lengths," including fabricating evidence, to apprehend and convict him. Ozuna also argues that Agent Lumpkin's testimony at a prior suppression hearing was relevant to Ozuna's knowledge that the trailer contained cocaine.[5]

---

[5] Ozuna seems to indicate that Lumpkin's testimony regarding his experience with truck drivers hauling cocaine is also

(continued...)

The court suppressed all of this evidence, either because it was irrelevant or because its probative value was outweighed by one of the concerns listed in Rule 403.

The district court has broad discretion to control the admission of evidence. *United States v. Khan*, 508 F.3d 413, 417 (7th Cir. 2007). "Evidence is relevant and therefore admissible if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *United States v. Van Allen*, 524 F.3d 814, 825 (7th Cir. 2008) (quoting Fed. R. Evid. 401). Under Rule 403, however, even relevant evidence may be excluded if its probative value is substantially outweighed by, for example, the danger of unfair prejudice. Fed. R. Evid. 403. Thus, a district court may exclude collateral or irrelevant evidence where its tendency to mislead and confuse the jury substantially outweighs its probative value. *United States v. Jackson*, 540 F.3d 578, 588 (7th Cir. 2008). We review a district court's evidentiary determinations for an abuse of discretion and reverse only "when no reasonable person could take the

---

[5] (...continued)
relevant to his theory of government fabrication. However, the substance of his argument makes clear that he is truly arguing that the testimony went to knowledge. Because we view the evidence as more relevant to Ozuna's knowledge than his conspiracy theory, we analyze it separately. At any rate, this evidence does not change our analysis, *see infra* Part II.B.2, that Ozuna did not present convincing evidence to support a theory that the government fabricated evidence against him.

view adopted by the trial court." *Khan*, 508 F.3d at 417 (quotations omitted). With this framework in mind, we now turn to Ozuna's arguments.

1. *Evidence of the Government's Allegedly Improper Conduct*

Ozuna points to evidence that he claims demonstrates that the government fabricated evidence to obtain a conviction. These include Agent Lumpkin's interactions with the Rios sisters, an allegedly fabricated DEA-6 form memorializing Lumpkin's conversation with Jessica Rios, and testimony about an allegedly orchestrated identification of Ozuna by Macias.[6] The district court held that all of this evidence was not material to Ozuna's guilt or innocence or was only tangentially related to the case at hand and excluded it. We conclude that this was not an abuse of discretion.

None of Ozuna's proffered evidence was relevant to his conduct on July 28, 2003, nor the evidence the government presented at trial. Ozuna simply made vague allegations of improper government conduct without ever connecting that conduct to his apprehension or the

---

[6] Ozuna also sought to enter into evidence various portions of the DEA manual. He claims that the agents' violation of certain protocols supports his theory of government fabrication. Each portion of the manual is tangential to this case, and as such, this argument is meritless and does not warrant further consideration.

search of his trailer. He did not make any connection whatsoever between the allegedly improper actions and the agents who were directly involved in the search. Thus, nothing about the evidence had any tendency to make more or less likely any fact of consequence to Ozuna's guilt. *See* Fed. R. Evid. 401. Instead, presenting this evidence would likely have confused the jury with tangentially related facts. Excluding the evidence was therefore not an abuse of discretion.

Ozuna correctly notes that even the Rules of Evidence cannot be used to deprive a defendant of his due process right to present a complete defense. *See Holmes v. South Carolina*, 547 U.S. 319, 324-27 (2006); *United States v. Harris*, 942 F.2d 1125, 1130-31 (7th Cir. 1991). We have held that "a defendant is entitled to have the jury consider any theory of the defense that is supported by the law *and that has some foundation in the evidence.*" *United States v. Wiman*, 77 F.3d 981, 985 (7th Cir. 1996) (emphasis added) (quotations omitted).

The problem with Ozuna's argument is that the theory that his conviction resulted from fabricated evidence has no foundation. As noted above, the excluded evidence had no bearing on what occurred on July 28, 2003. Had the government presented the allegedly fabricated evidence in its case-in-chief, our analysis may have been different. For example, if the government had used Macias's identification against Ozuna, certainly a claim that his identification was manufactured or orchestrated by the government would be relevant. Similarly, the Rios sisters' testimony was proper in the first trial because

Lumpkin had testified about the events after Ozuna's flight from prosecution. However, the government confined its case in this trial to the facts surrounding the search of his tractor-trailer. Ozuna has failed to connect any of his proffered evidence to the government's actions at that time or the agents involved in the search. Thus, the district court did not abuse its discretion in excluding the evidence.

2.  *Lumpkin's Testimony Regarding His Interactions with Truck Drivers*

During a suppression hearing on April 24, 2006, the district court questioned Agent Lumpkin about Ozuna's release. The purpose of this inquiry was to determine whether Aguilar, who had orchestrated the drug sale, would have been suspicious that Ozuna was cooperating with law enforcement because he was released after the cocaine was seized. Lumpkin stated that sometimes when trucks travel from Mexico to the United States, their drivers are unaware of what the warehouse had put into their trailers when loading produce. He further commented:

> A tractor-trailer holds 60 to 70,000 pounds, and in four small boxes of . . . what they say could be limes, they have commingled in there 50 or 80 or a couple hundred kilos of coke; you may not know. I mean, through my training and experience of working on the border, sometimes they—these guys don't know. And they followed all the rules,

> they checked their produce and checked it out and they have got the lock on the back and they're doing their job and sometimes it's not working for them.

Thus, Lumpkin noted, it would be reasonable for Aguilar to think that the agents had believed Ozuna when he said he didn't know the cocaine was in the truck.

Ozuna sought to admit this testimony at his trial. The district court refused. The judge noted that the fact that a truck driver might not know about the presence of controlled substances is self-evident and that expert testimony was not needed. He also commented that the circumstances regarding the situation Lumpkin described and Ozuna's situation were different. Ozuna had no paperwork for the limes, so they had no legitimate destination; their only purpose was to conceal the cocaine. Ozuna claims that this was an "obvious" abuse of discretion because "[t]he admission of this testimony would make Mr. Ozuna's claim that he did not know about the narcotics in the truck seem more likely to the jury." We disagree.

The district court did not abuse its discretion in determining that Lumpkin's testimony was not helpful to the jury. Lumpkin was not addressing whether it was possible that Ozuna *actually* knew about the cocaine. Instead, the purpose of describing this scenario was to determine whether Aguilar would have suspected Ozuna's cooperation with law enforcement because he was released. He concluded that Aguilar may have believed Ozuna's story because *sometimes* truck drivers are

unaware their trucks contain cocaine when they are legitimately transporting produce. Admitting this testimony would have allowed the jury to take Lumpkin's remarks out of context. It was therefore not an abuse of discretion to exclude them.

Furthermore, even if this was an error, it was harmless. An error is harmless when it does not affect the outcome of the trial, in other words, where we are "convinced that the jury would have convicted even absent the error." *United States v. Ortiz*, 474 F.3d 976, 982 (7th Cir. 2007), *cert. denied*, 128 S. Ct. 51 (2007). This testimony was one hypothetical postulation about some truck drivers in scenarios factually different from Ozuna's. It had little probative value into Ozuna's specific circumstance. The jury was informed by Ozuna's arguments and common sense that some truck drivers could be unaware that their trucks contain cocaine. We are convinced that the jury would have convicted Ozuna even if it had been allowed to consider Lumpkin's testimony.

## III. CONCLUSION

The district court did not err in reopening the suppression hearing to consider the handwriting testimony. The court was not required to conduct a *Daubert* analysis, and its ruling in light of the expert testimony at the hearing was not an abuse of discretion. Finally, the court did not err in excluding Ozuna's proffered evidence. We AFFIRM.